CITICORP LEASING, INC., Appellant,

v.

Jean WHITAKER and Joe Tillman, Individually and d/b/a Tillman and Whitaker Company; and Jos. L. Rozier Machinery Co., Appellees.

Jean WHITAKER and Joe Tillman, Individually and d/b/a Tillman & Whitaker Company and Joseph L. Rozier Machinery Company, Cross–Appellants,

v.

CITICORP LEASING, INC., Cross–Appellees.

Court of Appeals of Kentucky.

March 7, 1980.

Discretionary Review Denied Oct. 7, 1980.

David C. Fannin, Francis J. Mellen, Jr., Wyatt, Grafton & Sloss, Louisville, for appellant.

John V. Porter, Wells, Porter & Schmitt, Paintsville, for Jean Whitaker and Joe Tillman.

David Luther Woodward, Tampa, Fla., S. Howse Johnson, Johnson & Johnson, Paintsville, for Jos. L. Rozier Machinery Co.

Before GANT, HOWARD and WHITE, JJ.

HOWARD, Judge.

This is an appeal from the Johnson Circuit Court wherein the court held that the appellant could not recover certain sums under a conditional sales contract which had been assigned to it. The reason assigned for this decision was that the appellant was not a holder in due course, pursuant to KRS 355.9–206(1), and therefore the partnership herein could raise the defense of a failure of title and of consideration.

The partnership was a Florida based operation which desired to get into the coal business in Johnson County, Kentucky. In order to do this, they had to acquire earth–moving equipment. Lamb Brothers, a Florida Company that had been engaged in the

phosphate business, had a caterpillar D–8H bulldozer that it was offering for sale for $25,000.00. This will be referred to as the Lamb dozer. This Company also had in its possession, another bulldozer of like kind which it had rented from the appellee, Jos. L. Rozier Company. As the phosphate business was slack, this bulldozer was not in use. Whitaker and Tillman, hereinafter referred to as the partnership, bought the one dozer for $25,000.00 and attempted to buy the one from Rozier. Rozier refused to sell its bulldozer to the partnership but agreed to sell to the phosphate mining company for a figure of $58,666.67. This equipment will be referred to as the Rozier dozer.

The partnership had difficulty in getting financing for the purchase of this equipment, so Victor Stine, an employee of National Auction Company, was contacted. Stine discussed the matter with James Shackleford, the president of National Auction, and the partnership and National Auction thereupon agreed, without the knowledge or consent of Citicorp, to a plan whereby financing for the two bulldozers would be obtained from Citicorp. Under this scheme, National Auction would pretend to have the bulldozers sold to the partnership at a public auction in Gainesville, Florida, on September 8, 1976.

At this time, Citicorp had, for a few months, been arranging financing for some of the equipment sold at public auctions by National Auction. It appears from the evidence that there was no formal written agreement between Citicorp and National Auction as to the purchase by Citicorp of the paper held by National Auction. It is clear that the National Auction business was only a small fraction of Citicorp's financing business and that National Auction sold its paper to other financial institutions. Citicorp was not affiliated with National Auction in any way, it did not attempt to influence National Auction in the conduct of its auction operations, and it had refused requests by National Auction that Citicorp's name be inserted in National Auction's brochures. By the terms of an interim letter agreement between Citicorp and National Auction, Citicorp agreed to provide financing for equipment purchased at a National Auction sale provided (1) the sale was to a bona fide buyer, (2) a cash or check down payment of one–third (⅓) of the auction sale price was made by the buyer at the time of the sale, (3) the equipment was purchased at a publicly advertised auction, and (4) adequate credit information on the buyer was given to Citicorp.

Stine knew that Citicorp would finance only two–thirds (⅔) of the total purchase price of any equipment sold through National Auction, so he asked Tillman and Whitaker if they were prepared to make a one–third (⅓) cash down payment for the two bulldozers at the sham auction. Tillman and Whitaker said they were not, and it was agreed that the down payment requirement would be "satisfied" by also running through the sham auction a Caterpillar 966C Wheel Loader that was owned by Sylvan Shores, Inc., a corporation controlled by appellee Whitaker and his wife. Thus, the invoice to be shown to Citicorp to obtain financing would show a total "purchase price" that included all three pieces of equipment. Citicorp would be asked to finance only two–thirds of the invoice total–but this was 100% of the true value of the two bulldozers actually being purchased by Tillman and Whitaker from Lamb Brothers and Rozier, all in clear violation of the letter between Citicorp and National Auction on financing. Tillman and Whitaker were told by Stine that at least one piece of equipment would have to be brought to the auction site in Gainesville in order to "make it look legal," and the Rozier dozer was taken from the Lamb Brothers' yard to the auction site shortly before the time of the auction.

On September 8, 1976, the sham auction was held at Gainesville. Someone (the record is not clear as to who it was) pretended to make a public bid on the equipment on behalf of Tillman and Whitaker and, as prearranged, the Tillman and Whitaker "bid" was successful. Stine then made out an invoice which purported to show that three pieces of equipment–the Rozier dozer, the Lamb bulldozer, and the 966C Loader–

had been sold by National Auction to Tillman and Whitaker for a total purchase price of $118,700.00 and that check No. 12066 from Sylvan Shores, Inc. (the corporation owned by Whitaker and his wife) in the amount of $35,000.00 had been given as a down payment, leaving a balance of $83,700.00 to be financed by Citicorp. The false "sales figures" were arrived at by juggling the values of the three pieces of equipment so that Tillman and Whitaker would get 100% financing from Citicorp for the sum of $83,666.67 that Tillman and Whitaker had to pay to Lamb Brothers and Rozier ($58,666.67 for the Rozier dozer and $25,000.00 for the Lamb bulldozer). The Rozier dozer was listed on the false invoice at $65,000.00, the Lamb bulldozer was listed at $30,000.00, and the wheel loader was listed at $27,700.00, for a total of $108,700.00.

So that Citicorp could be misled into thinking that a cash downpayment had been made, Whitaker signed a check for $35,000.00 (No. 12066 on Whitaker's Sylvan Shores corporate account), and gave it to National Auction—even though he knew that there were not sufficient funds in that account to cover the check—because he was assured by Shackelford that National Auction would not attempt to cash the check. Whitaker knew the bogus check was to be shown to Citicorp as an inducement for the financing.

In addition, Whitaker and Tillman paid $8,300.00 to National Auction as a fee for arranging financing of the purchase. This "side transaction" providing for payment of a finder's fee to National was separate and distinct from any fee charged for actual auction services. Further, the $8,300.00 kickback payment was the only cash paid by Tillman and Whitaker, even though they subsequently signed a Conditional Sales Contract prepared from false information furnished by Stine containing the erroneous entry that a $35,000.00 cash down payment had been paid to National Auction.

After the sham auction was completed and the false invoice and bogus down payment check had been prepared, Citicorp was informed that Tillman and Whitaker had purchased equipment at a public auction from National Auction and wanted financing for two–thirds of the purchase price, having made a one–third cash down payment. Citicorp took credit information over the phone from Tillman and Whitaker and, having no reason whatsoever to doubt the statements made by National Auction and Tillman and Whitaker, decided to finance the equipment for Tillman and Whitaker. Ash Hoover, Citicorp's credit manager, testified that Citicorp provided financing on the assumption that the equipment had been sold at a bona fide auction, that it was sold at a fair price, and that an appropriate cash down payment had been made.

On September 10, 1976, Citicorp's Houston Office sent the necessary documents for this transaction by air express service to Victor Stine in Orlando. The documents included:

1. A Delivery and Acceptance Certificate. By signing this, Tillman and Whitaker would acknowledge receipt of the equipment.

2. A Conditional Sales Contract. By signing this, Tillman and Whitaker would agree to pay $83,856.00 principal and $19,508.28 interest in 36 monthly payments of $2,871.23 to National Auction or to any person to whom National Auction might assign the contract.

3. Three (3) UCC–1 Financing Statements. By signing these, Tillman and Whitaker would grant to National Auction or its assignee a security interest in the equipment.

4. An Insurance Endorsement Form to be completed by Tillman and Whitaker's insurance agent.

Stine picked up the above documents, along with a letter of instructions from Citicorp at the Orlando airport on September 10, and drove to Lake Placid. Tillman and Whitaker thereupon signed the documents in Stine's presence. After obtaining their signatures, Stine took these documents to Orlando and gave them to Shackelford, who signed the Conditional Sales Contract on behalf of National Auction. At the same time, Shackelford also signed on

behalf of National Auction an Assignment by which National Auction assigned to Citicorp the Conditional Sales Contract between National Auction and Tillman and Whitaker.

Citicorp paid National Auction for the assignment of the Conditional Sales Contract by issuing a check to National Auction on September 25, 1976. National Auction issued two checks on September 27, 1976, so that Tillman and Whitaker could pay Lamb and Rozier. The first check was in the amount of $58,666.67 and was payable to Lamb and Rozier jointly as payment for the Rozier dozer. The second check was in the amount of $25,000.00 and was payable to Lamb alone as payment for the Lamb bulldozer. Both checks were given by Stine and Whitaker to Emory Lamb, who telephoned Rozier to ask whether the $58,666.67 check should be hand carried to Rozier. He was told that this was not necessary and, upon Rozier's instructions, Lamb mailed the $58,666.67 check to Rozier and released both the Rozier bulldozer and the Lamb bulldozer to Whitaker.

This controversy arose because the check for $58,666.67, drawn by National Auction and made payable to Rozier and Lamb as payment for the Rozier dozer, was dishonored and has remained unpaid. Rozier brought an action in replevin in the Johnson Circuit Court to obtain possession of the bulldozer, and Tillman and Whitaker have refused to make payment to Citicorp under the Conditional Sales Contract. Tillman and Whitaker filed a cross–claim against Citicorp asking for rescission of the Conditional Sales Contract, and Citicorp filed a cross–claim against Tillman and Whitaker asking for (1) a Declaratory Judgment that Tillman and Whitaker be required to make payments on the contract, and (2) damages caused by the fraud involved in the sham auction.

After seven depositions, comprising over 500 pages, had been taken by the parties, cross–motions for summary judgment were made by Rozier, Citicorp, and Tillman and Whitaker. The trial court referred the case to the Commissioner, who circulated to the parties a draft report in which he recommended that a final judgment be entered:

(1) Granting possession of the Rozier bulldozer to Rozier;

(2) Dismissing Rozier's complaint as against Citicorp;

(3) Dismissing the cross–claim of Tillman and Whitaker against Citicorp;

(4) Granting judgment to Citicorp against Tillman and Whitaker on its cross–claim in the amount due under the Conditional Sales Contract.

Tillman and Whitaker thereupon filed lengthy exceptions and objections to the Commissioner's draft report, in which they contended that Citicorp was not entitled to judgment because of its "close connectedness" with National Auction. The Commissioner then filed "Recommendations of the Commissioner" in which he said that Tillman and Whitaker should be given an opportunity to present additional proof on this issue. The court then entered an Order which recited in relevant part:

Whitaker and Tillman are given 30 days from the date of this order to introduce evidence in conformity with the recommendations of the Master Commissioner . . . .

Although no further evidence had been introduced, the Commissioner then submitted a Final Report which was directly opposed to the previous draft with respect to the Rozier bulldozer. The Commissioner now recommended that Citicorp not be entitled to recover from Tillman and Whitaker for the Rozier bulldozer because of the "close connectedness" between Citicorp and National Auction.

On September 20, 1978, the trial court entered a final judgment holding, among other things, that Citicorp should recover against Tillman and Whitaker under the Conditional Sales Contract for the Lamb bulldozer and the 966C Wheel Loader, but that Citicorp's claim against Tillman and Whitaker for the Rozier dozer be dismissed; that the Commissioner's Report be confirmed; and that costs be allocated 10% to Rozier, 40% to Citicorp, and 50% to Tillman and Whitaker. Citicorp has appealed to

this Court from that portion of the Final Judgment granting summary judgment to Tillman and Whitaker, the confirmation of the Commissioner's Report and the allocation of costs.

We have examined the authorities cited by the trial court in support of its application of the close connections doctrine. The trial court cited two Kentucky cases—*Massey–Ferguson, Inc. v. Utley*, Ky., 439 S.W.2d 57 (1969) and *Sullivan v. United Dealers Corporation*, Ky., 486 S.W.2d 699 (1972). In the first case, it is apparent that it is distinguishable from the case before this Court. Citicorp is not a manufacturer. Rather, Citicorp is a financial institution which the court, in *Massey–Ferguson*, found to be deserving of insulation from liability in order to encourage the supplying of credit for the buying of goods. In other words, Massey–Ferguson was a manufacturer and handled its own finance paper. Obviously there was a close connection in that situation. In the second case cited above, the court found for the defendant, assignee of a note and mortgage, but by way of dictum, stated as follows:

> Where a close business association between the payee and one who purchases an instrument from him implies the knowledge of such facts as to show bad faith or renders himself a participant in the transaction between the payee and the maker, a finding that such purchaser is not a holder in due course has been regarded as supportable.

█ Nevertheless, we do not believe that the doctrine of close connections has been adopted in cases similar to the one at bar in the State of Kentucky, but even if so, we do not find that there was sufficient evidence in the record to show bad faith on the part of Citicorp, or that it was a participant in the transaction between the payee or the maker. The findings of the trial court in this regard seemed to rely on certain facts that really are not significant in the commercial world. Certainly, the furnishing of forms to be used by National Auction, credit checks, and the other matters mentioned in this opinion, are nothing out of the ordi-

nary in this type of business. Most people have experienced much the same thing in the purchase and financing of a new car and appliances. These matters do not show a participation in the deal or bad faith. The only bad faith that is shown in this record is that of National Auction and the partnership.

It would be unconscionable for the partnership to take advantage of a situation in which they did so much to help bring about. The whole transaction between the partnership and National Auction fairly reeks with fraud, and the fact that Rosier retained its lien on the dozer by reason of the bad check, should certainly not give the partnership an excuse to avoid its legal obligations to Citicorp.

In regard to the doctrine of close connections, White and Summers *Uniform Commercial Code* has a section on this point and this may be found on pages 479–484. It is clear in reading this text that while the courts in other jurisdictions have permitted defenses against a holder in due course, in avoiding the obligations of commercial paper, these holdings have invariably been in cases where there is a consumer involved who has been given a raw deal. A classic example is where a consumer has purchased a product which is a "lemon" but is still obligated to make the financing payments to an assignee of the conditional sales contract. As we have pointed out before, the partnership has not received a raw deal from anyone in this case and should not be afforded relief by reason of the close connection doctrine. It is our view that the Commissioner was correct in his first opinion but that the second opinion, confirmed by the trial court, was clearly erroneous in regard to the rights of the appellant, which is the subject matter of this appeal.

█ On cross appeal it is argued that the trial court erred in permitting recovery by Citicorp of the 966 wheel loader because Citicorp was not a holder in due course. There is no merit in this argument for reasons heretofore set out. Further complaint was made by the partnership of the allocation of court costs by the trial court.

They argue that Citicorp should pay all of the court costs. However, we hold that the partnership should pay all the cost of this action. *Darby v. Van Meter*, 155 Ky. 462, 159 S.W. 940 (1913) and *Shannon v. Stratton & Terstegge*, 144 Ky. 26, 137 S.W. 850 (1911).

Lastly, the partnership asks, in the alternative, that no recovery can be had by Citicorp for alleged future unearned interest and financial charges. This issue was not presented in the trial court and, therefore, it cannot be raised for the first time on appeal.

Therefore, this case is reversed with directions to the trial court to render a judgment in favor of Citicorp Leasing, Inc., against Jean Whitaker and Joe Tillman, individually, and d/b/a Tillman and Whitaker Company, for all amounts owed to Citicorp Leasing, Inc., represented by its conditional sales contract, and that the referred to individuals and partnership be required to pay all the costs of this action.

All concur.