INTERNATIONAL HARVESTER
CREDIT CORPORATION

v.

James E. HILL and Vernon D. Houston.

No. 79–2017–NE–CV.

United States District Court,
M. D. Tennessee,
Northeastern Division.

Oct. 15, 1979.

As Amended Nov. 1, 1980.

James A. Ridley, III of Kramer, Johnson, Rayson, McVeigh & Leake, Knoxville, Tenn., Craig J. Donaldson, Memphis, Tenn., for plaintiff.

Joe M. Looney of Looney, Looney & Conner, Crossville, Tenn., for defendants.

## MEMORANDUM

MORTON, Chief Judge.

This replevin suit seeking possession of an International tractor and disc was instituted by International Harvester Credit Corporation, a Delaware corporation with its principal place of business in Illinois, against James E. Hill and Vernon R. Houston, citizens and residents of Cumberland County, Tennessee. The value of the equipment is in excess of $10,000.00. This court has jurisdiction pursuant to 28 U.S.C. § 1332.

The facts of this case as hereinafter found by the court reflect the willfully fraudulent acts of an insolvent franchise dealer of International Harvester Company, aided and abetted by his brother and others.

In 1977, International Harvester Company granted a franchise for the sale of its products to John Hatfield (hereinafter referred to as John), an individual proprietorship operating under the name of Hatfield International. The inventory was floor planned (financed) by plaintiff International Harvester Credit Corporation (IHCC), a wholly-owned subsidiary of International Harvester Company. On January 1, 1978, James Hatfield (James), brother of John, became general manager but with no ownership in the business. Apart from the business of Hatfield International, John and James Hatfield operated a farming enterprise. Although the record is not clear as to the role of James, there is strong evidence that he was an employee of John's in this enterprise. This fact is not critical since it is clear that John was the predominant figure in the farming operation.

By early March 1978, Hatfield was out of trust in the floor plan arrangement[1] as to

one item, but the equipment, the subject of this case, was present on the sales lot for sale to the public until April 18, 1978. Prior to March 21, 1978, John decided to sell the equipment in question to Professional Leasing, Inc., and lease it back allegedly for the purpose of using it in the farm enterprise. Due to his large financial commitments of other indebtedness, at the suggestion of Professional, the title was transferred to Professional and leased back to James. The funds were paid to Hatfield International, and the equipment was leased by lease purchase arrangement to James by instrument of March 21, 1978. The address of the lessee was the same as Hatfield International, although the location of the equipment was stated to be Route 1, Jamestown, Tennessee (a farm of John's). The equipment remained on the sales lot of Hatfield International from March 21, 1978, until April 18, 1978, except for one occasion of 1 to 3 hours when the tractor was transported to the Jamestown farm for the sole purpose of setting a plow for sale to a customer of Hatfield International. The equipment was never operated in the farm enterprise. Professional Leasing, through its employees, were aware of the above facts, except for the plow setting incident. Around April 1 or shortly thereafter, the employee of Professional who participated in the lease back to James began working for John at Hatfield International.

On April 18, 1978, defendants purchased the equipment in question from the sales lot of Hatfield International with John making the sale and James being aware thereof. The former employee of Professional prepared the sales documents. The defendants were bona fide purchasers who gave valuable consideration for the equipment, executed a purchase contract and agreed to make installment payments totaling (including finance charges) $60,837.64, the first payment being due December 1, 1978. This sales contract was for value assigned

---

1. The plaintiff immediately upon learning of this situation demanded payment for the "out-of-trust" items, collected for them and initiated

steps which led to the termination of the Hatfield franchise.

and delivered to the plaintiff on April 19, 1978. The equipment was delivered to defendants.

The financing statement covering the floor plan of Hatfield International's inventory in favor of plaintiff was filed with the Secretary of State of the State of Tennessee on November 17, 1977. The financing statement specifying the lease to James by Professional was filed with the Secretary of State of the State of Tennessee on April 11, 1978. A Uniform Commercial Code financing statement specifying the sale to defendants and the purchase money debt due Hatfield International (passing to plaintiffs by assignment) was filed with the Register of Deeds in Cumberland County, Tennessee, on April 20, 1978. Plaintiffs had no knowledge of the sale to Professional.

In November 1978, defendants were informed by John and James that the equipment had been sold twice. Thereafter defendants with full notice of the claims of plaintiff and Professional, after consultation with their attorney, elected to atone to and pay Professional. They assert that they do not owe plaintiff any sum. Thus this suit.

■ Under the *Erie* doctrine, the federal court in a diversity action will apply the law of the state in which it sits including that state's choice of law rule. *MacPherson v. MacPherson*, 377 F.Supp. 794, 796 (M.D.Tenn.1973), *rev'd on other grounds*, 496 F.2d 258 (6th Cir. 1974). The Tennessee rule is that, subject to the qualification that a contrary intent will control, the law of the place of the making of the contract will prevail. "[A] contract is presumed to be made with reference to the law of the place where it was entered into unless it appears that it was entered into in good faith with reference to the law of some other state." *First American National Bank v. Automobile Insurance Co.*, 252 F.2d 62, 64 (6th Cir. 1958). The contract in the case at bar was entered into in the State of Tennessee, no intention of the parties that the law of any other state should be looked to in that regard appears, and Tennessee law will therefore govern. *See*

*Deaton v. Vise*, 186 Tenn. 364, 210 S.W.2d 665, 668 (1948). Where there is no controlling authority in Tennessee, relevant cases from other jurisdictions will be examined.

It is regretful that this case "concerns, in its essence, the question of which of two basically innocent parties shall be made to bear a loss occasioned by the wrongful conduct of a third party who, because of financial incapacity, is unable to respond in damages." *Chemical Bank v. Penny Plate, Inc.*, 144 N.J.Super. 390, 365 A.2d 945, 951 (1976).

The defendants in this action first seek to avoid the replevin by asserting that there was a total want or failure of consideration. The defendants maintain that, inasmuch as the seller did not have good title to the equipment when they purchased it, the contract is invalid *ab initio*.

The defendants further assert that IHCC can stand in no better position than the seller in this action and that a "waiver of defenses clause" contained in the contract is invalid as to them. The clause in question appears at the top of the reverse side of the contract and reads as follows:

ASSIGNMENT: As used herein "holder" shall mean seller, or if this contract is assigned, assignee of the seller. In the event seller assigns this contract, upon notice of such assignment, purchaser agrees to make all payments hereunder directly to such assignee and the original seller shall not be the agent of the holder for transmission of payments or otherwise. Assignee shall be entitled to all rights of the seller free from any defense, set-off or counterclaim by the purchaser.

Immediately below the above appears a separate paragraph employing the "anti-holder in due course" language of the Federal Trade Commission's ruling reserving defenses and claims in consumer transactions promulgated as 16 C.F.R. § 433 (1979). It reads:

In the event the equipment covered by this contract is used for *personal, family or household* purposes, the above waiver of defense clause is of no effect and the following notice shall apply:

NOTICE

ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.

(Emphasis in the original.)

▮ The defendants' attacks upon the validity of the waiver of defenses clause and the question of a lack of consideration will be taken seriatim. The defendants first claim that personal defenses may be raised against the plaintiff because the plaintiff is not a holder in due course of a negotiable instrument. The court agrees that the installment sales contract here does not meet the requirements of negotiability, and the plaintiff is, therefore, not a holder in due course. However, under T.C.A. § 47–9–206, where the buyer waives as to an assignee any claims or defenses he may have against the seller or lessor, that is "enforceable by an assignee who takes his assignment for value, in good faith without notice of a claim or defense, except as to defenses of a type which may be asserted against a holder in due course of a negotiable instrument under the chapter on commercial paper (chapter 3 of this title)." T.C.A. § 47–9–206(1). This provision clearly expresses the intention, in non-consumer purchases, to give the creditor-assignee the protection of a holder in due course if the instrument is taken for value, in good faith, and without notice that it is overdue, has been dishonored, or of any defense or claim to it on the part of any person as required by T.C.A. § 47–3–302(1). *See* Note, *Finance Company as Holder in Due Course*, 51 Ky.L.J. 134, 139–40 (1962). The same result was reached in *ITT–Industrial Corp. v. Milo Concrete Co.*, 31 N.C.App. 450, 229 S.E.2d 814 (1976) in discussion of an identical provision enacted by the North Carolina legislature. *Id.* at 454, 229 S.E.2d at 818. It is the finding of this court that IHCC, as assignee, took the contract in question in good faith, for value, and without notice of any claims or defenses. The sale of the tractor and disc to Professional Leasing had been for cash, and there is no authority for the proposition that the fact that Hatfield International was found to be out of trust on a prior occasion would provide any notice to IHCC that equipment was being sold for the second time. Moreover, the court notes that Professional Leasing filed its financing statement with the Secretary of State rather than with the office of the register in the county of the debtor's residence as required by T.C.A. § 47–9–401(1)(a). The fact that the tractor was equipment owned by Professional Leasing for leasing purposes does not change its status from farm equipment. It is the actual use to which the equipment is put and not the occupational status of the owner which is determinative. *Sequoia Machinery, Inc. v. Jarrett*, 410 F.2d 1116 (9th Cir. 1969) (combine is farm equipment even though its owner is not a farmer); *In re Anderson*, 6 UCC Rep. Serve. 1284 (S.D. Ohio 1969) (both cases involving bankruptcy). This further failed to put IHCC on notice of any irregularities with regard to the assigned contract.

The defendants then assert that the waiver is void as against the public policy of Tennessee relying upon *Discount Purchasing v. Porch*, 12 UCC Rep.Serv. 600 (Tenn. App.1973). That case, however, is not controlling here. *Porch* held that waiver of defense clauses are invalid as to *consumer goods*, not equipment. Its rationale is similar to that of the Federal Trade Commission as stated in its Statement of Basis and Purpose pursuant to 16 C.F.R. § 433, Preservation of Consumers' Claims and Defenses, 40 Fed.Reg. 53506–529 (1975). Goods are "equipment" if they are "used or bought for use primarily in business (including farming or a profession) . . . ." T.C.A. § 47–9–109.

▮ Nor can it be said that the defendants were consumers in making their purchase. Of course, broadly speaking, every buyer is a "consumer." Nevertheless, it has

traditionally been that buyers who utilize goods for business purposes are differentiated from buyers of more personalized items. T.C.A. § 47–9–109 indicates that goods are consumer goods if they are bought primarily for personal, family or household use. Treated separately are equipment, farm products, and inventory. The fact that the defendants would personally use it does not mean it was for "personal use." To this court, it is beyond the pale that the tractor and disc were equipment, not consumer goods, and that the purchasers were not "consumers" within the contemplation of the Uniform Commercial Code. *Porch* does not contain any expression which indicates that a waiver of defense clause in a commercial transaction is contra the public policy of this state. Indeed, the statutory embodiment permitting such a waiver may be said to accurately reflect the public policy of Tennessee. *See generally*, Note, *Waiver of Defense Clauses in Retail Installment Contracts Are Contrary to Tennessee Public Policy*, 5 Memphis St. U.L.Rev. 265 (1974).

The defendants next claim that the presence of the waiver clause in the contract is "further evidence that IHCC is not a holder in due course . . . because if they were a holder in due course there would be no need for such a waiver provision." This argument is without merit. As indicated above, IHCC is not a holder in due course; rather, by a separate provision, the Code affords an assignee in the proper circumstances a similar status.

Defendants further contend that the Federal Trade Commission regulations concerning the sale or leasing of goods or services to consumers, 16 C.F.R. § 433 (1979), apply to this transaction. The court will not linger upon this assertion for it is abundantly clear from the language of the regulation ("goods or services for personal, family, or household use"), the Statement of Basis and Purpose for the regulation, 40 Fed.Reg. 53506 (1975), and the foregoing discussion concerning consumer purchases, that the regulation can in no way be stretched to include this form of commercial dealing.

■ Returning to T.C.A. § 47–9–206, the defendants point to the opening language dealing with waiver of defenses which indicates that the Code provision permitting the waiver is subject to "any statute or decision which establishes a different rule for buyers or lessees of *consumer goods* . . . ." (Emphasis supplied.) They claim, necessarily, that this is a consumer transaction and that the provision has been modified by both decision and statute. For the reasons outlined above, this court is of the opinion that this transaction is not a consumer purchase and therefore this language is inapplicable. As the official comments to this section indicate, "Under subsection (1) such clauses [waiver of defenses] in a security agreement are validated outside the consumer field . . . ." T.C.A. § 47–9–206, Comment 1. Therefore the question of whether a waiver is valid in Tennessee under either the holding in *Porch, supra*, or the Retail Instalment Sales Act, T.C.A. § 47–11–101, *et seq.*, is not a valid consideration in the field of commercial sales. The Retail Instalment Sales Act is, by definition, limited to consumer transactions and does not cover personalty sold for commercial or industrial use. T.C.A. § 47–11–102(a). *See generally*, Bankester, *Personal Property and Sales—1959 Tennessee Survey*, 12 Vand.L.Rev. 1270, 1278–80 (1959). Therefore, T.C.A. § 47–9–206(1) is unaffected and controlling. *ITT–Industrial Credit Corp. v. Milo Concrete Co.*, 31 N.C.App. 450, 229 S.E.2d 814, 818 (1976).

As a general rule, courts in circumstances such as those involved here have upheld waivers of defenses as to assignees. *See, e. g., Root v. John Deere Co.*, 413 S.W.2d 901 (Ky.1967). There, where the seller of a farm tractor assigned the "Time Sale Agreement" of a conditional sale to the manufacturer of the tractor, and the contract contained a waiver of defenses clause as to the assignee, the buyer could not assert personal defenses (there, breach of warranty) against the assignee. The court found that the waiver was authorized under UCC 9–206(1), that it was a form of negative covenant, and that it was valid. *Id.* at

902–03. *See also, Morgan v. John Deere Co.*, 394 S.W.2d 453 (Ky.1965).

Naturally, as with all general rules, there is an exception. The defendants have alluded to it by way of commercial paper and negotiable instruments of law. Thereunder, courts have closely examined the relationship between the seller and the alleged holder in due course where the entities involved were so closely linked as to be virtually indistinguishable for purposes of the holder in due course doctrine. The single case which the defendants cite, *AVCO Security Corp. v. Post*, 42 A.D.2d 395, 348 N.Y.S.2d 409, 13 UCC Rep.Serv. 845 (App. Div.1973), is not particularly instructive. It involved an appeal from a discovery order and, again, was a consumer credit transaction. The court is aware of numerous decisions which have not recognized waivers based on a close relationship between the assignee and assignor, but these, too, primarily involved consumer goods. *See, e. g., Commercial Credit Co. v. Childs*, 199 Ark. 1073, 137 S.W.2d 260 (1940) (Automobile); *Calvert Credit Corp. v. Williams*, 244 A.2d 494 (D.C.Ct.App.1968) (Televisions); *Unico v. Owen*, 50 N.J. 101, 232 A.2d 405 (1967) (records and stereo); *Nassau Discount Corp. v. Allen*, 44 Misc.2d 1007, 255 N.Y. S.2d 608 (Civ.Ct.1965) (books).

Nevertheless, the defendants' contentions on this point are not easily disposed of or resolved. The defendants assert that IHCC financed the floor plan for John Hatfield, had an agreement to purchase his sales contracts, and furnished him with form contracts and assignments. The court also notes that the assignment clauses are printed on the form and are exclusively to and with IHCC. This, coupled with the fact that Hatfield International had been out of trust on a previous occasion, was, the defendants contend, sufficient to put IHCC on notice as to possible defenses. At this stage the defendants cite T.C.A. § 47–3–302 dealing with notice in negotiable instruments. However, the court will treat the notice challenge as one dealing with the notice requirements of T.C.A. § 47–9–206(1).

On this point, the court has reviewed *Massey-Ferguson v. Utley*, 439 S.W.2d 57 (Ky.1969) cited with approval in *Massey-Ferguson Credit Corp. v. Brown*, 169 Mont. 396, 547 P.2d 846, 850 (1976). In *Utley*, the defendant bought a combine from a dealer and executed an installment sales contract which was immediately assigned to the manufacturer. The defendant defaulted, Massey-Ferguson sued, and Utley defended on breach of warranty. Massey-Ferguson asserted the waiver of defenses clause in the sales contract. The court reviewed cases collected in 44 A.L.R.2d 8, 157–61, which involved circumstances in which (1) a manufacturer's representative assisted or participated in the sale by the dealer, and (2) the manufacturer's course of dealing was for it to furnish blank sales contracts to its dealer and for the dealer to immediately and routinely assign the contract as soon as the sale was made. *Utley* contained both these factors. The court then opined:

> We consider it to be the policy of the Uniform Commercial Code to encourage the supplying of credit for the buying of goods by insulating the lender from lawsuits over the quality of the goods. But we conceive the insulation was intended primarily for *financial institutions* rather than the manufacturer who finances his own sales. He needs no inducement to supply credit for the purchase of his goods because the whole object of his business is to sell his goods.

*Massey-Ferguson v. Utley*, 439 S.W.2d 57, 60 (Ky.1969). *Root, supra,* was distinguished on the ground that a manufacturer's representative was not present at the time of the sale and did not otherwise participate.

Indeed, the participation in the sale by the manufacturer in some capacity appears to be pivotal. This is well illustrated by *Massey-Ferguson Credit Corp. v. Brown*, 567 P.2d 440 (Mont.1977). The court there found that where the fraud arose by virtue of the assignor's conduct and facts showed that there was participation in the formation of the contract by the assignee and a close relationship with the assignor, a waiver of defenses would not apply. In that

circumstance, the assignee will stand in the same shoes as the assignor. *Id.* at 444. Absent that participation, an assignee would not be liable. *Id.* at 444–45.

■ The court has not found the case, nor has its attention been directed to one, in which a waiver of defenses clause in a commercial sales contract has been invalidated in the absence of participation therein by the assignee and based on a close relationship alone. Therefore this court declines to do so. The defendants are held to have waived all defenses except those which would otherwise be effective against a holder in due course. Failure or want of consideration is not among these, and the defense is therefore unavailable to the defendants in this instance.

The court notes the following from the defendants' reply brief in passing: "Tennessee Code Annotated, § 47–9–318 defines the defenses available to a debtor against the assignee of a contract. They include '. . . (b) any other defense or claim of the account debtor against the assignor. . . .' In other words, IHCC stands in precisely the same position as would John Hatfield d/b/a Hatfield International had he attempted to enforce the contract." The cited provision is grossly misquoted through the use of language out of context. The quoted section applies, according to the opening language of the statute, "[u]nless an account debtor has made an enforceable agreement not to assert defenses or claims arising out of a sale as provided in § 47–9–206 . . . ." T.C.A. § 47–9–318(1). Since this court has found the waiver enforceable, further discussion of T.C.A. § 47–9–318 is unnecessary.

The above holding is buttressed by the following conclusions. Under the doctrine of entrustment, codified as T.C.A. § 47–2–403, John Hatfield had the ability to pass, and the defendants to take, good title in the tractor and disc. T.C.A. § 47–2–403(2) provides: "Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in ordinary course of business." Subsection (3)

states: " 'Entrusting' includes any delivery and any acquiescence in retention of possession regardless of any condition expressed between the parties to the delivery or acquiescence and regardless of whether the procurement of the entrusting or the possessor's disposition of the goods have been such as to be larcenous under the criminal law."

■ The provisions of the UCC in this section have the effect of narrowing the application of the retention of possession doctrine (under § 25 of the Uniform Sales Act) to the commercial situation in which a merchant in goods of the type in question has retained possession of those goods and resold them to a buyer in the ordinary course of business. Warren, *Cutting Off Claims of Ownership Under the Uniform Commercial Code*, 30 U.Chi.L.Rev. 469, 474 (1963). By definition, subsection (3) includes the situation in which the buyer does not take delivery of the goods but "suffers the seller to retain possession after a sale." *Id.*

■ That is the situation here. Professional Leasing allowed the equipment to remain in the hands of Hatfield International, unquestionably a merchant in "goods of that kind," after the sale. Professional Leasing knew of their location at all times and the fact that they were technically under lease to the entrustee's brother is of no import. The goods were entrusted by acquiescence. The defendants were bona fide purchasers for value in the ordinary course of business and good title passed to them as a result of T.C.A. § 47–2–403. *Couch v. Cockroft*, 490 S.W.2d 713 (Tenn. App.1972), *cert. denied, Id.; Medico Leasing Co. v. Smith*, 457 P.2d 548 (Okla.1969). The result was not different at common law. *Hawkins v. Davis*, 67 Tenn. 506 (1875); *Parham v. Riley,* 44 Tenn. 5 (1867).

The defendants also quote language from 2 R. Anderson, Uniform Commercial Code, § 2–403 (2d ed. 1971) out of context to indicate that the entrustment doctrine cannot inure to the benefit of creditors. The full quotation is as follows: "The entrust-

ment provision of the Code only protects a purchaser and does not protect a creditor even though the latter has a security interest in the inventory of the dealer and in property hereinafter acquired by the dealer, since such a term does not embrace property of a third person merely entrusted to a dealer." *Id.* The case cited for that proposition is of no assistance to the defendants. It involved an automobile which had been entrusted to the car dealership of the owner's brother-in-law. In a brief opinion, the court held that the automobile could not be sold for the benefit of a creditor of the dealership in bankruptcy—a situation very different from the instant case. *See Cosgriff v. Liberty National Bank & Trust Co.,* 58 Misc.2d 884, 296 N.Y.S.2d 517 (1968). Here the provisions of T.C.A. § 47–2–403 apply.

With the issues of law decided in a manner adverse to the defendants, they maintain that this court should exercise its equitable power in order to grant relief. The facts, however, are not compelling in this regard. Not every unfortunate result of law justifies the invocation of the equity courts. Here the defendants paid Professional Leasing with full knowledge of the contract, the assignment to IHCC, and the waiver of defenses clause. The defendants had other avenues available to them other than flying in the face of their contractual terms and prematurely making payment voluntarily. The court must therefore decline the defendants' invitation to alter its decision at law through the powers of equity.

Therefore, it is concluded that the plaintiff is entitled to a judgment in the amount of forty-six thousand nine hundred and forty dollars and eighty-five cents ($46,-940.85). Pursuant to the contract in question and, in accordance with T.C.A. §§ 47–14–123 and 47–14–121, the plaintiff is further entitled to interest thereon in the amount of ten percent (10%) from the date of the breach, December 1,

Judgment in the above amount and the cost of the cause and for possession of the property in question is for the plaintiff.

The officer will be directed to take the property out of the possession of the defendants and deliver the same to the plaintiff. The plaintiff will dispose of said property in accordance with the applicable provisions of the Uniform Commercial Code, and will thereafter notify the defendants of the amount to be credited against this judgment prior to the issuance of any writ of execution.

Finally, the plaintiff has demanded a judgment against the defendants in the amount of any deficiency remaining after the disposition of the collateral, together with late fees, expenses, and reasonable attorney's fees. T.C.A. § 23–2348 would appear to preclude a deficiency judgment at this time: "no deficiency judgment shall be obtained by the plaintiff(s) until plaintiff(s) shall have complied with all requirements of the Uniform Commercial Code applicable thereto." Further, no evidence has been presented as to the amount of any late fees, expenses, and reasonable attorney's fees, and the court will not pass on these at this time. A hearing will be set for that determination.

An appropriate order will be entered.