**LEASING SERVICE CORPORATION,**
Plaintiff-Appellee,

v.

**RIVER CITY CONSTRUCTION, INC.,**
and Welborn Dent,
Defendants-Appellants.

No. 83–7545.

United States Court of Appeals,
Eleventh Circuit.

Oct. 9, 1984.

obtain a warrant. Baron testified he only dis- closed the location when he was threatened.

Stanley Bynum, Birmingham, Ala., for defendants-appellants.

Alan W. Heldman, Michael L. Hall, Johnston, Barton, Proctor, Swedlaw and Naff, Birmingham, Ala., for plaintiff-appellee.

Before HILL and HENDERSON, Circuit Judges, and WISDOM*, Senior Circuit Judge.

WISDOM, Senior Circuit Judge:

Chatham Machinery, Inc. leased two large cranes to River City Construction

Company, the defendant-appellant in this diversity action. Chatham assigned the lease to Leasing Service Corporation, the plaintiff-appellee. When River City, lessee, defaulted on the lease, Leasing Service repossessed the equipment, sold it, and brought this suit for a deficiency judgment against the lessee. The district court entered judgment in favor of Leasing Service. River City appeals, arguing that Leasing Service did not meet the requirements of a holder in due course and was subject to an alleged defense against the original lessor; that the sale of the repossessed equipment was not commercially reasonable; and that Leasing Service was not entitled to collect "unearned or unaccrued interest" upon the acceleration of the balance owed. We affirm, with modification, the district court's judgment for Leasing Service.

## I. FACTS AND PRIOR PROCEEDINGS

River City installs prefabricated steel products in construction projects in Georgia, Alabama, and Mississippi. Its offices and the residence of its sole shareholder and president, Mr. Welborn Dent, are located in Birmingham, Alabama. In 1979, the company began leasing two heavy duty truck cranes from Chatham Machinery, Inc. In early 1980, Chatham's main creditor, which held the title to the equipment in question and to much of Chatham's inventory, began to press for repayment. In the spring of 1980, Theodore Shearouse, an employee of Chatham, asked Dent to transfer the financing on the two cranes to Leasing Service. The purported benefits for River City were lower monthly terms and a longer "payout period". Shearouse testified that he told Dent, "in the event that River City was unable to make a payment or payments on either crane, there would be no claim for a deficiency brought by anyone either against River City or Mr. Dent": Chatham would simply sell off the cranes in the event of nonpayment (Shearouse Aff. at 3).

---

* Honorable John Minor Wisdom, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

In July 1980, Chatham and River City entered into a written equipment lease that Leasing Service had prepared. Dent personally guaranteed the rental payments. This lease agreement was then immediately assigned to Leasing Service. The agreement called for an initial payment ("advance rent") of $105,163, an immediate rental payment of $7500, and monthly "installments" of $7500 thereafter for 77 months. The "Total Rent" thus came to $690,163. Under the terms of a separate agreement, River City had the option to purchase the equipment at the end of the lease's term for $40,300.

Unlike River City's prior agreement with Chatham, which called only for the delinquent rent and fifteen percent of that amount as attorney's fees in the event of default, the densely worded form contract prepared by Leasing Service contained a panoply of creditor's remedies: an acceleration clause, a liquidated damages provision for 15% of the total rent, a provision for attorney's fees of 20% of "any amount sought", waiver of trial by jury, appointment of attorney-in-fact for service, confession of judgment ("except in any jurisdiction where such action is not permitted by law"), and waiver or release from any appraisal, stay, or exemption laws. Late charges of 1/15th of one percent per day (24% annually) were due on "delinquent" payments.

River City made the required payments from August 1980 through July 1981 and then defaulted. As permitted by the lease, Leasing Service repossessed the equipment in October 1981. It then disposed of the equipment at a public auction in Birmingham on December 1, 1981. Before the auction, Leasing Service published notice of the sale in the Birmingham News, the Decatur Daily, and a trade magazine; it also notified River City and Dent of the sale by certified mail on November 19, 1981. Welborn Dent attended the sale. The two pieces of equipment brought a total of $330,000. Expenses of the sale were $372.49.

After the sale, Leasing Service attempted to collect the outstanding balance and various fees and damages from River City. On July 29, 1982, Leasing Service sued in the Southern District of New York for the amount River City allegedly owed. On motion by River City, Judge Weinfeld transferred the action to the Northern District of Alabama. On the plaintiff's motion for summary judgment, the district judge held that there were no issues of material fact, and awarded Leasing Service judgment against River City for $304,185.[1]

## II. ISSUES ON APPEAL

River City raised numerous affirmative defenses in the district court. It now urges that the district court erred in dismissing these defenses. We consider each in turn.

### A. *Gearing Up: Conflict of Laws*

 If the action had remained in the Southern District of New York, that court would have applied New York's choice of law rule. *Erie v. Tompkins*, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. The transfer pursuant to 28 U.S.C. § 1404(a) did not change the choice of law to be applied. *Van Dusen v. Barrack*, 1964, 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945. In New York, the main factor in determining which law to apply is the express intention of the parties. *Reger v. National Association of Bedding Mfrs.*, 1975, 83 Misc.2d 527, 372 N.Y.S.2d 97; U.C.C. § 1–105. This contract provided that the "enforceability and effectiveness of each provision shall be determined by the law of the state of residence or principal place of business of Lessee [Alabama] or Lessor [New York] or the original lessor [Georgia], whichever may render each such provision effective". Because New York, Alabama, and Georgia

---

**1.** The deficiency as of December 1, 1981, was $553,246.67. The district court added $40,000 more for damages for a "purchase option", $372.49 for the expenses of the sale, $31,406.30 for interest from December 1, 1981, to June 30, 1983, and $8,859.76 for attorney's fees. Sales proceeds were $330,000. The court's award thus came to $304,185.30.

all would have upheld the contract provisions, New York law applies, as correctly determined by the district court.

## B. *Building the First Defense: Fraud in the Inducement*

The defendants argue that Chatham perpetuated fraud when Dent executed the July 1980 agreement and that this fraud constitutes a defense against Leasing Service. Specifically, River City contends that Shearouse, acting for Chatham, represented that River City would not be liable to Leasing Service in the event of default: Leasing Service allegedly was "on recourse" with Chatham; in the event of River City's default, Chatham would repossess the equipment and make good any deficiency to Leasing Service. Dent also contended that Shearouse showed him a "recourse agreement" between Chatham and Leasing Service. The defendants were unable to obtain this document through discovery. If proven, this fraud would constitute a defense against Chatham. River City now seeks to assert that defense against Leasing Service.

■■■ The assignee of a non-negotiable chose in action or of an unendorsed negotiable note payable to order takes it subject to all defenses which the obligor may have had against the assignor, even though he buys it for value and in good faith. This general rule, however, must yield when the nature or terms of the contract show that it was to be assigned free from such equities. An assignee and a buyer or lessee can contractually agree that the buyer or lessee will not assert any claim he may have against the seller or lessor. *See* U.C.C. § 9–206.

■■■ In the instant case, the first term of the contract between Chatham and River City waived the defense that River City now asserts:

"Lessee further acknowledges notice of the intended assignment of this lease to [Leasing Service] and upon such assignment, Lessee agrees not to assert against the Lessor and any subsequent Assignee any defense, setoff, recoupment, claim or counterclaim which Lessee may have against the original lessor...."

Because of the great protection these waivers afford an assignee,[2] they are valid only if the assignee takes the assignment for value, in good faith, and without notice of any claim or defense. These are the Code's requirements for the status of a holder in due course. *See* Ala.Code § 7–9–206(1); Ga.Code Ann. § 109A–9–206(1); N.Y.U.C.C. § 9–206(1) (McKinney's 1964). Thus, although the waiver of defense clause may effectively grant the assignee the same protection as a holder in due course, the assignee enjoys such protection only when he meets the tests for a true holder in due course. *International Harvestor Credit Corp. v. Hill*, M.D.Tenn. 1979, 496 F.Supp. 329; *First New Eng. Fin'l Corp. v. Woffard*, Fla.1982, 421 So.2d 590. That the agreement here was a lease rather than a true negotiable instrument does not preclude the assignee's enjoying the status of a holder in due course. *United Counties Trust Co. v. Mac Lum, Inc.*, 5 Cir.1981, 643 F.2d 1140, 1144; *Banker's Trust Co. v. Litton Systems, Inc.*, 2 Cir. 1979, 599 F.2d 488, 491. River City must therefore show either that Leasing Service is not entitled to the status of a holder in due course or that there is a "real" defense that would lie against even a holder in due course.

### 1. *Status of Holder in Due Course*

River City argues that Leasing Service is not entitled to the status of holder in due course because of an alleged lack of good faith in taking the assignment. River City contends that there are close connections between Chatham and Leasing Service (Chatham used a form from Leasing Service for its lease and assignment) and that Chatham's immediate assignment to Leas-

**2.** Courts have even applied the rule to demand payment to an assignee even though the assignor totally failed to perform. *Agri-Stor Credit Corp. v. Lewellen*, D.Miss.1979, 472 F.Supp. 46; *National Bank of North America v. DeLuxe Poster Co.*, 1976, 378 N.Y.S.2d 462, 51 A.D.2d 582.

ing Service precludes a finding of good faith. *Rehurek v. Chrysler Credit Corp.,* Fla.App.1972, 262 So.2d 452; *Commercial Credit Co. v. Childs,* 1940, 199 Ark. 1073, 137 S.W.2d 260.

These cases, however, are not apposite. In *Rehurek,* an auto manufacturer formed a credit company exclusively for the purpose of financing the sale of Chrysler's products. The finance company, Chrysler Credit, prepared the financing forms and investigated the credit rating of buyers. Most of the retail sales of the dealership were assigned to Chrysler Credit. Chrysler Credit dealt exclusively with Chrysler dealerships. In *Commercial Credit,* the assignee financing company also had close connections with an auto dealership, and the Arkansas Supreme Court refused to overturn the circuit court's judgment against the assignor.

■ Both *Rehurek* and *Commercial Credit* are immediately distinguishable from the case at hand because they involve consumer credit. Other courts have permitted these defenses against a holder in due course, but only where there is a consumer involved who has been given a "raw deal". *See* White & Summers, *Uniform Commercial Code* 479–84 (1980) (collecting such cases). Courts have long afforded consumers greater protection than commercial debtors in enforcing waiver of defense clauses. *See International Harvester Credit Corp. v. Hill,* M.D.Tenn.1979, 496 F.Supp. 329. The FTC has even codified this consumer protection against holder-in-due-course status in recent regulations. Cf., 16 C.F.R. Pt. 433 (effective May 14, 1976). River City, however, here engages in a commercial rather than a consumer transaction.

There are, of course, commercial cases in which a court has held that the seller and the alleged holder in due course were so closely linked that the entities were indistinguishable for purposes of the holder in due course doctrine. *See, e.g., Massey-Ferguson v. Utley,* Ky.1969, 439 S.W.2d 57; *Massey-Ferguson Credit Corp. v. Brown,* 1976, 169 Mont. 396, 547 P.2d 846; 44 A.L.

R.2d 8, 157–61 (collecting other citations). In those cases, the manufacturer's representatives either assisted or participated in the sale by the dealer, and the manufacturer's course of dealing was, to furnish blank sales contracts to its dealer and to have the dealer assign the contract routinely as soon as the sale was made. According to the *Utley* court:

"We consider it to be the policy of the Uniform Commercial Code to encourage the supplying of credit for the buying of goods by insulating the lender from lawsuits over the quality of the goods. But we conceived the insulation was intended primarily for *financial institutions* rather than the manufacturer who finances his own sales. He needs no inducement to supply credit for the purchase of his goods because the whole object of his business is to sell goods."

439 S.W.2d at 60 (emphasis added).

■ In the instant case, by contrast, Leasing Service has not dealt exclusively with Chatham, nor has Chatham dealt exclusively with Leasing Service. Leasing Service is a national financial institution that contracts with numerous equipment dealers. Chatham deals with other financial institutions in arranging its leases. The arrangement between Chatham and Leasing Service appears to be the very type of transaction that the Uniform Commercial Code sought to protect.

We have not been able to locate any case in which the court has invalidated a waiver of defense clause in a commercial transaction based on close connections alone. Generally, it is not enough that a creditor furnishes forms for a transaction. Such a practice is common in the world of commercial transactions. *See Citicorp Leasing v. Whitaker,* Ky.App.1980, 605 S.W.2d 24, 28. Mere allegations of close connections based on the frequent presence of Leasing Service employees in Chatham's office are also insufficient. The defendant would have to make the additional showing that the assignee had actual or constructive knowledge of Chatham's alleged fraudulent practices. *Vasquez v. Superior Court,* 1971,

94 Cal.Rptr. 796, 484 P.2d 964, 4 Cal.3d 800. Or the defendant would have to show that the assignee participated sufficiently in the original transaction to be subject to any claims against the original obligee. *Massey-Ferguson Credit Corp. v. Brown,* 1977, 173 Mont. 253, 567 P.2d 440. On the record before us, we cannot hold that the district court was clearly erroneous in summarily holding that Leasing Service has the status of a holder in due course.

### 2. *Fraud as a Defense*

River City has argued in the alternative that even if Leasing Service is entitled to the status of a holder in due course, the agreement sued upon is void because of alleged fraud. Fraud is a defense against a holder in due course under U.C.C. section 3–305 only if:

> "(c) such misrepresentation ... has induced the party to sign the instrument with neither knowledge nor reasonable opportunity to obtain knowledge of its character or essential terms."

This provision is codified in Alabama, Georgia, and Mississippi. Ala.Code § 7–3–305; Ga.Code Ann. § 109A–9–305; N.Y.U.C.C. § 3–305. River City must therefore prove both that Dent lacked knowledge of the character and essential terms of the agreement and that he did not have a reasonable opportunity to obtain such knowledge.

■ Section 3–305 follows common law in recognizing "real" fraud or "fraud in the factum" as a defense against a holder in due course. Real fraud must be within the instrument itself; it must concern the very nature of the agreement. *Chemical Bank v. Haskell,* 1980, 51 N.Y.2d 85, 432 N.Y. S.2d 478, 411 N.E.2d 1339. *Chase Manhattan Bank v. Finger Lakes Motors, Inc.,* 1979, 102 Misc.2d 48, 423 N.Y.S.2d 128. Leasing Service contends that this defense fails here because Welborn Dent knew that he was executing a lease, and that this lease would be assigned to Leasing Service. Leasing Service further argues that the alleged misrepresentation was merely a "side-promise" pertaining to "details", and that even with the misrepresentation "River City had knowledge of both its character and its essential terms" (Brief for Appellees at 18). At least one court has held that an alleged promise to shield a defendant from personal liability was not sufficient to constitute real fraud. *FDIC v. Balistreri,* E.D.Wisc.1979, 470 F.Supp. 752.

■ It is possible, of course, that a purported agreement which exonerates the defendants from $390,000 liability (total payments under the 77-month lease were $690,000) is no side-promise but instead is a "material term" of the relation between the two parties. "Under this provision the defense extends to knowledge that it is a negotiable instrument, but without knowledge of its essential terms." U.C.C. § 3–305 comment 7. The alleged misrepresentation would thus constitute real fraud. We need not reach this question, however, because the defendants have failed to satisfy the second prong of section 3–305's defense against a holder in due course: The obligor had reasonable opportunity to know the character and terms of the instrument.

According to the Official Comment to section 3–305:

> "The test of the defense here is that of excusable ignorance.... In determining what is a reasonable opportunity all relevant factors are to be taken into account, including the age and sex of the party, his intelligence, education, and business experience; ... the representations made to him and his reason to rely on them or to have confidence in the person making them; the presence or absence of any third person who might read or explain the instrument to him ...; and the apparent necessity, or lack of it, for acting without delay."

U.C.C. § 3–305 comment 7. We uphold the district court's implicit finding that there was no defense under section 3–305. Although the defendant has only an eighth-grade education, he is president of a construction company with projects in Georgia, Alabama, and Mississippi. He has leased heavy equipment before. There was no

rush in the transaction: Dent was first approached in the spring of 1980 about the leasing transaction; the forms were not executed until June. Although we can readily sympathize with Dent's claim that he did not understand the terms of this lease, we cannot overlook the fact that Dent had a full opportunity to study the agreement or to seek the aid of counsel. The case thus fails to clear the second of the two hurdles for a defense of fraud against an assignee with the same status as that of a holder in due course.

## C. Grounds for Commercial Reasonableness

Both in the district court and on appeal, the defendants have contended that the sale of the two cranes at the December 1st auction was not commercially reasonable under the U.C.C. The plaintiffs counter that because the underlying transaction was a lease and not a credit sale, the provisions of the U.C.C. would apply only by analogy and that the sale should actually be judged under the terms of the lease. Because we find that the sale met the U.C.C.'s stricter standard, we need not decide whether it would be proper to apply the U.C.C.'s standard or the terms of the lease to this question.

 Under New York's choice-of-law principles, the law of the place of repossession controls the issue of commercial reasonableness. *Associates Discount Corp. v. Cary*, 2 U.C.C.R.S. 937, 47 Misc.2d 369, 262 N.Y.S.2d 646 (N.Y.Civ.Ct.1965). We therefore apply Alabama law. Generally, the issue of commercial reasonableness is a question for the jury. *Henderson v. Hanson*, 414 So.2d 971 (Ala.Civ.App. 1982). Where there are no disputes as to material facts, however, the issue becomes a question of law. *Credit Alliance Corp. v. Cornelius & Rush*, N.D.Ala.1980, 508 F.Supp. 63, 67; *Credit Alliance Corp. v. David O. Crump Sand & Fill Co.*, S.D.N.Y.1979, 470 F.Supp. 489. The defendants here have admitted all the facts with respect to Leasing Service's disposition of the collateral. There is therefore no "genuine issue of material fact" regarding the disposition. *David O. Crump*, 470 F.Supp. at 494–95. The defendants are not entitled to reversal of summary judgment merely because they "dispute the claim of adequate notice" or "every aspect" of notice: These are allegations and conclusions concerning a matter of law. Although the question is a close one, we decline to hold that the notification here is sufficiently different from that of *Cornelius* to require a reversal of the district court's finding that the sale was commercially reasonable.

## D. Reconstructing the Lease

River City vigorously contends that the agreement executed between River City and Chatham was not a lease but a conditional sale agreement. River City further contends that because the agreement is actually a conditional sale, the installment "rental" payments are actually principal and interest payments. River City urges that it is unconscionable for a creditor on a security agreement to collect unaccrued finance charges under an acceleration clause. *Credit Alliance Corp. v. Adams Construction Corp.*, Ky.1978, 570 S.W.2d 283. River City argues strongly that this Court should overturn part of the damages as an improper award of unaccrued finance charges.

 A document is construed according to the intent of the parties as ascertained from factors that distinguish true leases from security agreements. *See United States ex rel. Eddie's Sales & Leasing, Inc. v. Federal Insurance Co.*, 30 U.C.C. R.S. 713, 634 F.2d 1050 (10th Cir.1980); *In re Brother's Coach Corp.*, 9 U.C.C.Rep. 502 (E.D.N.Y.1971).

 The cases to which defendants have referred us all concern whether a purported lease created a security interest for the lessee in the equipment being leased. *E.g., American Standard Credit, Inc. v. National Cement Co.*, 5 Cir.1981, 643 F.2d 248; *Matter of Tillery*, 5 Cir.1978, 571 F.2d 1361; *Commerce Union Bank v. John Deere Industrial Equipment Company*, Ala.1980, 387 So.2d 787; *In re Al-*

*pha Creamery Co.,* 4 U.C.C.R.S. 794 (W.D. Mich.1967). In these cases, courts went behind the terms of the agreement to protect the legitimate interests of innocent third parties (e.g., a trustee in bankruptcy) against a "disguised" security agreement. Courts have intervened in such cases because the failure to file a financing statement by the supposed lessor created inequities against third parties that the filing requirements of Article 9 were meant to cure. We have seen no cases where a court has held a lease to be a conditional sale when only the interests of the contracting parties were in issue. In these instances, courts have generally held that parties to a contract could not later argue that the agreement was, in reality, something else. It is undisputed that both parties treated their agreement as a lease for tax purposes, enabling River City to deduct its monthly payments. The district court held that the agreement was a lease. There is insufficient evidence in the record before us to justify overturning its ruling on this question.

### E. *Shoring up the Verdict*

In reviewing the district court's opinion, we find an error in the calculation of damages. We therefore amend the damage award, reducing the amount by $40,000.

The district court properly struck the provision for 15% liquidated damages when the plaintiff waived the claim to these damages for the sake of summary judgment:

"Defendants question whether in view of the lease amount specified as purchase price, the 15% liquidated damages clause fairly and reasonably approximates the anticipated damages or whether it is unenforceable as a penalty. The district court in *Leasing Service Corp. v. Broetje,* 545 F.Supp. 362, 367 n. 4 (S.D.N. Y.1982) found this question to involve a material issue of fact. In view of the granting of summary judgment on the balance of its claim plaintiff does not contest this assertion and thereby waives the resolution of this issue by trial. *Cf.*

*Leasing Services* [sic] *Corp[.] v. Justice,* 673 F.2d 70 (2d Cir.1982)."

District Court op. at 2.

▮▮▮▮ Apparently relying on footnote 4 of *Broetje,* in which the district court there said in dicta that the liquidated damages provision was a substitute for the value of the leased machinery at the end of the lease, the district court substituted the putative fair market value of the machinery at the end of the lease ($40,000) for the liquidated damages (0.15 × $570,000, or $75,000). (The district judge may have arrived at this valuation relying upon plaintiff's contention that the purchase option price of $40,300 reflected the probable value of the equipment at that time.) Our difficulty with the award, however, centers not on this inference, but rather on the award of any damages for the breach of the purchase option. The award of $40,000 damages would be proper, of course, if the defendants had contracted to purchase the machinery for that sum at the end of the lease. If defendants had accepted the option as provided in the terms of that agreement, a valid and binding contract to purchase would have come into existence. Defendants would then be liable for damages in the event of default.

Here, however, no binding contract of sale came into existence. The purchase option is merely an offer by the seller to hold an offer open to the potential buyer for a certain time. Until River City accepted the offer, there was no valid, enforceable agreement. *Piazza v. Sutherland,* 1967, 279 N.Y.S.2d 640, 53 Misc.2d 726. If the offer is not accepted, the optioner is under no obligation to convey the property, and the optionee is under no obligation to buy. *Bartholf v. Hautala,* 1959, 22 Misc.2d 46, 194 N.Y.S.2d 660. At the time of breach, the lessor could not have exercised this option even if it wished, since the option by its terms became effective only at the end of the lease's term. There is no actual contract to purchase. As the plaintiff admits in its own appellate brief: "[T]he option instrument simply never became effective and there never was a pur-

chase option." Appellee's Brief 5; *see also id.* at 32 ("[N]o option ever came into existence.").

Damages cannot be awarded upon a contract not yet in existence. Damages therefore must be limited to losses arising out of the termination of the actual rental. The purchase option never came into force and was never exercised. The damages for the breach of the "purchase option", set by the district court at $40,000, must therefore be stricken from the award.

Judgment for appellees is AFFIRMED, with damages reduced by $40,000.