**James H. SOUTHARD and Classic Car Investments, Inc., Plaintiffs-Appellants,**

v.

**FORBES, INC., Defendant-Appellee.**

**No. 77–3076.**

United States Court of Appeals, Fifth Circuit.

Jan. 17, 1979.

Rehearing and Rehearing En Banc Denied Feb. 16, 1979.

Joseph R. Manning, Glenn A. Delk, Atlanta, Ga., for plaintiffs-appellants.

Kirk M. McAlpin, Atlanta, Ga., Tennyson Schad, New York City, C. David Vaughan, Atlanta, Ga., for defendant-appellee.

Before BROWN, Chief Judge, TUTTLE and THORNBERRY, Circuit Judges.

TUTTLE, Circuit Judge:

James H. Southard, a dealer in antique automobiles and chairman of the board and principal stockholder of plaintiff Classic Car Investments, Inc. ("Classic"), brought this libel suit on the basis of an article about the plaintiffs' line of business in *Forbes* magazine, published by the defendant Forbes, Inc. ("Forbes"). The district court granted the defendant's motion for summary judgment, ruling that the article was not defamatory of the plaintiffs and was protected by the privilege of fair comment. We affirm.

In its July 15, 1974, issue *Forbes* published an article entitled "Degradation of a Hobby." The article was written by Alvin A. Butkus, a regular *Forbes* writer with ten

years experience, as part of a series which the magazine publishes dealing with the investment aspects of "collectibles," items such as artwork that generally have interested collectors rather than investors.

The article discussed the growing field of investment in "classic," or antique, cars. It was clearly critical of speculators and promoters in this field, whom it called "the quick buck boys." The subheading of the article stated: "Want to be the first on your block to get burned in the latest speculative craze? Then get yourself an 'old' car." The gist of the article was to question the certainty of enormous appreciation in the value of old cars claimed by some of the promoters of the investment, and to warn would-be investors of some of the pitfalls of such investments.

The article included a chart, headed "Hottest Cars Around," illustrating some of the most dramatic instances of appreciation in value of old cars and including projections of future prices. A fine print footnote to the chart attributed as the source of the information it contained "Old Car Value Guides and Classic Car Investments." In fact, Classic did not furnish all of the future price estimates and the chart did not include the quality rating criteria used in the antique car industry to rate prices.

The final paragraph of the article discussed Southard:

How far can the craze go? Who can say? The Dutch tulip bulb mania in the 17th century was the prototype of such irrational booms. Some professionals are already licking their chops over prospects for the next round of higher prices. Jim Southard, a former Atlanta stockbroker turned auto collector-dealer, is readying investment programs in classic cars for profit-sharing and pension plans. His strategy is to sell such programs to groups of doctors, lawyers and corporations. They will get the appreciating value of the car and he will get a management fee and possibly even storage fees. "Investing in cars is just like buying stocks, except you don't have the downside risk," argues Southard. "You buy the highest quality, where demand is greatest and supply is small. The value of those cars never goes down, so you're guaranteed to make money." If he made claims like that for stocks, Southard would be in the soup. But there is no Securities & Exchange Commission for classic cars.

The quotations attributed to Southard in this paragraph were not verbatim quotes but a "distillation" of comments he made to reporter Butkus. Butkus' transcript and notes showed that Southard used similar, but less emphatic, language.[1]

The day after this article appeared, the Securities and Exchange Commission, prompted by the article, began an informal inquiry to determine whether Southard and Classic were selling unregistered securities in violation of federal securities law. The inquiry led to no formal SEC action.[2]

Southard and Classic filed suit for defamation against Forbes in the United States District Court for the Northern District of Georgia. They alleged that the article was libelous because it charged antique car dealers in general with unethical business practices, and Southard and Classic in particular with violations of federal securities law or with unethical business practices. Following substantial discovery, the district court granted the defendant's motion for summary judgment. The court ruled that as a matter of Georgia law nothing in the article was defamatory of either plaintiff, and that

---

1. The transcript showed that he said: "And this knowledge, again, knowledge, the same thing I was taught for years in the stock market. . . . Basically the same thing, only in this type of thing you don't have the downside that you've got in the market." Butkus' notes read: "Buy quality—price bonded [sic] to go up—so make money. Can't be made again. . . . Buy quality—bound to make money."

2. The precise reasons for which the SEC initiated and then terminated its inquiry are not clear, since the SEC did not disclose information in this respect pursuant to the Freedom of Information Act's exemption for intra-agency memoranda, 5 U.S.C. § 552(b)(5).

the misquotations of Southard were privileged under the doctrine of fair comment.

Both parties agree that Georgia law governs this case. Georgia law defines libel as a publication "tending to injure the reputation of any individual and expose him to public hatred, contempt, or ridicule . . ." Ga.Code Ann. §§ 105–701, 703.[3] Although part of the definition of slander, a charge "made against another in reference to his trade, office, or profession" which is "calculated to injure him therein" also gives rise to a libel action. Ga.Code Ann. § 105–702.[4]

■ A publication which on its face is necessarily within these statutory definitions is considered libelous per se. *Holmes v. Clisby*, 118 Ga. 820, 822, 45 S.E. 684 (1903) (predecessor statute). It is for the court, upon appropriate motion, initially to determine whether the publication at issue is defamatory as a matter of law. If as a matter of law the publication is not defamatory, the case must be dismissed. *Garland v. State*, 211 Ga. 44, 46, 84 S.E.2d 9 (1954). If the publication is defamatory per se, the jury is instructed accordingly. *Weatherholt v. Howard*, 143 Ga. 41, 42, 84 S.E. 119 (1915). If the publication has no necessarily defamatory meaning, but can be understood in more than one way, one of which is defamatory, then it is for the jury to decide if, on the basis of some innuendo resulting from the circumstances surrounding the publication, the publication in fact had that defamatory meaning. *Holmes v. Clisby, supra*, 118 Ga. at 822–23, 45 S.E. at 685–86; *Sheley v. Southeastern Newspapers, Inc.*, 87 Ga.App. 167, 171, 73 S.E.2d 211 (1952) and cases cited therein.

■ These distinctions between libel per se and libel by innuendo do not affect the court's initial task of determining whether the publication is capable of defamatory meaning. Accordingly, the essential question before us in reviewing the grant of summary judgment in this case is whether the publication in *Forbes* is reasonably capable of some meaning defamatory of James Southard or Classic Car Investments, Inc. In considering this question, we must construe the publication "as a whole . . in [its] plain, natural, and ordinary meaning, . . . as other people would understand [it], according to the sense in which [it] appear[s] to have been published and the idea [it was] meant to convey." *Garland v. State, supra*, 211 Ga. at 46, 84 S.E.2d at 11.

The appellants urge that the *Forbes* article defamed them because it charged them with illegal activities, namely violation of federal securities laws. The crux of their argument is that the statements in the article that Southard was "readying investment programs in classic cars for profit-sharing and pension plans" in which investors "will get the appreciating value of the car and [Southard] will get a management fee and possibly even storage fees" charged him with the sale of "investment contracts." Since the willful sale of an unregistered security is unlawful,[5] and "security" includes an "investment contract,"[6] the appellants argue, the effect of this charge was to impute to Southard the unlawful sale of a security. They contend that this charge was reinforced by final sentences of the article: "If he made claims like that for

3. Ga.Code Ann. § 105–701 provides:

A libel is a false and malicious defamation of another, expressed in print, or writing, or pictures, or signs, tending to injure the reputation of an individual, and exposing him to public hatred, contempt, or ridicule. The publication of the libelous matter is essential to recovery.

Ga.Code Ann. § 105–703 provides:

Any false and malicious defamation of another in any newspaper, magazine, or periodical, tending to injure the reputation of any individual and expose him to public hatred, contempt, or ridicule, shall constitute a newspaper libel, the publication of such libelous matter being essential to recovery.

4. Ga.Code Ann. § 105–702 provides in pertinent part:

Slander, or oral defamation, consists, . . third, in charges made against another in reference to his trade, office, or profession, calculated to injure him therein; . . . damage is inferred.

5. 15 U.S.C. § 77e(c).

6. *S. E. C. v. W. J. Howey Co.*, 328 U.S. 293, 298–299, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946).

stocks, Southard would be in the soup. But there is no S.E.C. for classic cars."

The district court correctly found that nothing on the face of the article explicitly accuses Southard of violating federal securities law. Nor do the activities explicitly attributed to Southard on their face make out the elements of a securities law violation. Thus, we cannot accept that the article was defamatory of Southard and Classic Car Investments as a matter of law.

The appellants contend that even if the article is not defamatory on its face, the article as a whole nevertheless can be understood as implying violation of securities law or at least unethical business conduct. They argue that, to a reading audience as sophisticated in business affairs as *Forbes*', "investment program" plus "management fees" equals investment contracts. In the context of the misquoted guarantees of a large return on classic car investments, the omission of the rating system in the price chart, the article's derogatory attitude towards the claims of classic car dealers in general, and the article's comment that Southard's statements would put him "in the soup" if he were selling stocks, this equation would lead the reader to conclude that he was selling unregistered securities. As evidence of this implication, the appellants point to the S.E.C. inquiry that followed the publication of the article. They also introduced the affidavit of Thomas Sherrard, a professor of corporate and securities law, who stated that he interpreted the article as implying that Southard was selling unregistered securities. Accordingly, the appellants maintain that the *Forbes* article was capable of defamatory interpretation, and the district court erred in granting summary judgment because the appellant should have had the opportunity to have a jury determine if in fact the defamatory interpretation should be placed upon the article.

The meaning which the appellants urge as a basis for denying summary judgment goes beyond that which the ordinary reader of *Forbes* would place on the article. It requires too attenuated a series of inferences: the reader would have to conclude first that the sale of antique autos as part of an investment program in which the seller would receive management fees was a sale within the legal definition of a security; then that this security was unregistered; and finally that the violation of securities law was willful. We are not satisfied that the inferences drawn by legal experts in securities law show that an audience as undoubtedly sophisticated in securities transactions as *Forbes*' reasonably would draw the same conclusion, much less that the "person of ordinary capability"[7] would do so.

While the statement that Southard would be "in the soup" is clearly capable of defamatory meaning, that statement was conditioned on Southard's selling stocks and thus coming within SEC purview. The article then said: "There is no SEC for classic cars." As the appellants conceded at oral argument, the latter language explicitly takes Southard out of "the soup," negating the implication that Southard's activities or statements were unlawful. The appellants thus seek by the innuendo they claim to impart to the *Forbes* article a meaning which the article itself denies. But, words which are not defamatory "cannot have their natural meaning enlarged by innuendo." *Central of Ga. Rwy. Co. v. Sheftall*, 118 Ga. 865, 867, 45 S.E. 687, 689 (1903). "The purpose of innuendo is to explain ambiguities in the charge made in the statement, and cannot introduce any new matter." *Garland v. State*, 211 Ga. 44, 46, 84 S.E.2d 9, 11 (1954).

We find that the *Forbes* article, in its ordinary and natural meaning reasonably can be understood as suggesting at worst that Southard and other classic car dealers were puffing the value of investment in classic cars to an extent beyond that permitted in the marketing of securities; that this puffing was exploitative; and that some SEC-like regulation perhaps should

---

7. *Southeastern Newspapers, Inc. v. Walker*, 76 Ga.App. 57, 60, 44 S.E.2d 697 (1947), *quoting*

*Little v. Barlow*, 26 Ga. 423, 425, 71 Am.Dec. 219, 220 (1858).

intervene against such puffery. The fundamental message was caveat emptor to potential customers of Southard and others in his business.

This caveat undoubtedly was unfavorable publicity for Southard, but unfavorable commercial publicity as such is not defamation. "[I]t lacks the element of personal disgrace necessary for defamation." W. Prosser, *Handbook of the Law of Torts* § 111 at 740 (4th ed. 1971). It does not amount to a publication which tends to expose Southard and Classic "to public hatred, contempt, or ridicule . . .," as required by Ga.Code Ann. §§ 105–701, 703. Nor does it charge Southard with activities incompatible with the proper exercise of Southard's business. The publication was therefore not "calculated to injure him" in his trade, as required by Ga.Code Ann. § 105–702.[8] We hold as a matter of law that this publication was not capable of a meaning defamatory of Southard or of Classic Car Investments, Inc.[9]

■ In so deciding, we have the benefit of a record fully developed through affidavits and depositions presented on the defendant's motion for summary judgment. Where there is such a record and it "demonstrates that, construing all of the facts and inferences to be drawn therefrom in favor of the party against whom the judgment is entered, he would not be entitled to have a jury verdict stand, we have not hesitated to hold that the grant of summary judgment is proper." *Time, Inc. v. McLaney*, 406 F.2d 565, 572 (5th Cir.), *cert. denied* 395 U.S. 922, 89 S.Ct. 1776, 23 L.Ed.2d 239 (1969). We bear in mind that a careful look at whether an eventual jury verdict could stand is especially appropriate in libel actions, because the very pendency of a lawsuit may exert the chilling effect which *New York Times Co. v. Sullivan*[10] and its progeny seek to guard against. *Bon Air Hotel, Inc. v. Time, Inc.*, 426 F.2d 858, 865 (5th Cir. 1970); *Time, Inc. v. McLaney, supra*, 406 F.2d at 566; *Thompson v. Evening Star Newspaper Co.*, 129 U.S.App.D.C. 299, 394 F.2d 774, 776, *cert. denied* 393 U.S. 884, 89 S.Ct. 194, 21 L.Ed.2d 160 (1968).

■ Our approval of the use of summary judgment in libel cases has come where judgment has been granted on the

---

**8.** *Cf. Hood v. Dun & Bradstreet, Inc.*, 335 F.Supp. 170, 177 (N.D.Ga.1971) (allegations of doubtful creditworthiness not per se incompatible with proper exercise of contractor's business and to that extent not defamatory), *rev'd on other grounds*, 486 F.2d 25 (5th Cir. 1973), *cert. denied*, 415 U.S. 985, 94 S.Ct. 1580, 39 L.Ed.2d 882 (1974).

**9.** The district court considered the article's references to each of the plaintiffs separately. With respect to Classic Car Investments, the court considered only the effect of the attribution to Classic as the source for the chart ·showing various instances of appreciation in the value of classic cars because there was no mention of Classic in the text of the article. The court concluded that even if this attribution or the concomitant omission of the point rating system for antique cars was a misrepresentation, the misrepresentation did not rise to the level of defamation within the meaning of Ga.Code Ann. § 105–701. The district court also ruled that it is "well-settled" that Classic would not be defamed vicariously by references to Southard, one of its officers, or to the industry of which the company is a part.

Although Classic Car Investments, Inc. appeals from the district court's ruling, the appellant's brief does not challenge these rulings concerning Classic. In any case, we need not

address ourselves to these rulings because if the *Forbes* article was not defamatory of Southard, a fortiori it was not defamatory of Classic.

The district court also issued a secondary ruling that the misquotations of Southard's comments concerning the reliability of investment in antique cars were protected by the privilege of "fair comment" because they fairly represented what Southard said. In addition to this question of privilege, the parties have argued the question whether Southard was a public figure within the meaning of *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) and whether, accordingly, summary judgment was appropriate because there is insufficient evidence that *Forbes'* statements concerning Southard were made with the knowing falsehood or reckless disregard of the truth required by *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Because we find at the threshold that there was no defamation, we need not consider whether either of these privileges against liability apply in this case.

**10.** 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

issue of "actual malice" as defined in *New York Times Co. v. Sullivan*,[11] an issue which lends itself to summary judgment because actual malice must be shown with "convincing clarity," *New York Times Co. v. Sullivan, supra*, 376 U.S. at 285–86, 84 S.Ct. 710. Summary judgment is equally appropriate on the issue whether there is defamation. The protective rationale for summary judgment in libel cases remains the same no matter what the issue on which judgment is granted. Moreover, where no "substantial danger to reputation is apparent"[12] the press should be more carefully guarded against exposure to liability for defamation than where clearly defamatory content warns it of liability. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 348, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Too broad a definition of defamation may curtail "uninhibited, robust and wide-open"[13] discussion as much as may too low a standard of proof.

For these reasons, we hold that the district court did not err in granting Forbes, Inc.'s motion for summary judgment.

The judgment is AFFIRMED.

JOHN R. BROWN, Chief Judge, concurring:

I concur in the result and all of the opinion save that I disavow the implication in the concluding portion that the *Times-Sullivan* First Amendment protection justifies or compels summary judgment for the media where, on the usual accepted principles, it might otherwise fail.

THORNBERRY, Circuit Judge, dissenting:

It is with great reluctance that I dissent from an opinion of a majority as esteemed as the one in this case. I am compelled, however, to register my dissent because I believe there is a jury question presented

whether the *Forbes* article is capable of a defamatory meaning. To support my position, I need not demonstrate that the article is defamatory: I need only show that the article is capable of two meanings, one defamatory and the other not defamatory.

Southard has presented this court with a plethora of theories why this article is defamatory. Most of his arguments can be dismissed out of hand and the court properly does so. He presents two, however, that are at least colorable. His first theory suggests that the article falsely accuses him of securities law violations in that Southard sold investment contracts without the proper registration. I agree with Judge Tuttle that this theory is strained and simply requires inferences that are too sophisticated for the average *Forbes* reader.

Southard's second argument, however, I believe, presents a jury question. Essentially, this theory is based upon the concluding sentences in the article: "If he made claims like that for stocks, Southard would be in the soup. But there is no Securities & Exchange Commission for classic cars."

The majority states that this statement is "clearly capable of defamatory meaning." At 144. But the majority states that since the second sentence explicitly takes Southard "out of the soup" any implications that Southard was guilty of illegal conduct is negated. I disagree. The second sentence does not negate the inference that Southard is guilty of illegal conduct. It negates the inference that the SEC can do something about it. In effect, the article can be read as accusing Southard of improper business practices, albeit practices outside the jurisdiction of the SEC.

I would not be surprised to find that the public associates the work of the SEC with stock fraud.[1] Given this inference, I think

---

**11.** *See, e. g., Bon Air Hotel, supra*, 426 F.2d at 864.

**12.** *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 155, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967).

**13.** *New York Times Co. v. Sullivan, supra*, 376 U.S. at 270, 84 S.Ct. 720.

**1.** In *Orr v. Argus-Press*, 586 F.2d 1108 (6 Cir. 1978), the Sixth Circuit was faced with a defamation case in which the plaintiff had been charged with various securities law violations. A newspaper article had described these charges as "fraud." The Sixth Circuit held that the "word 'fraud' . . . is both accurate

Southard should be allowed to argue to a jury that the *Forbes* article accuses him of fraud or improper business practice with relation to classic cars, but that the traditional guardian against fraudulent business activities is without power to do anything about it because Southard's fraud is outside the jurisdiction of the SEC.

Because I think the article has two reasonable readings—the non-defamatory one posited by Judge Tuttle and the defamatory one suggested by myself—I think a jury question is presented and summary judgment is inappropriate.[2] I reach this conclusion notwithstanding my agreement with the standard by which we consider the grant of summary judgment in libel cases as stated by Judge Tuttle.

Since I have made these comments under the protective luxury of a dissent, I need not speculate about Southard's status as a plaintiff nor his ability to prove *Forbes* guilty of actual malice, if Southard is a public figure.

and appropriate to describe a violation of Michigan's securities laws."

**2.** For a similar uncomplimentary article in the financial press, *see Reliance Insurance Co. v. Barrons*, 442 F.Supp. 1341, 1345 (S.D.N.Y. 1977).