**Flint DAVIS, Plaintiff–Appellee,**

v.

**SEARS, ROEBUCK AND COMPANY and Bruce Mason, Defendants–Appellants.**

No. 88–5334.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 13, 1989.

Decided April 24, 1989.

Rehearing Denied May 23, 1989.

---

Kenneth E. Hall, Barry K. Maxwell (argued), T. Harold Pinkley, and Egerton, McAfee, Armistead & Davis, Knoxville, Tenn., for Flint Davis, plaintiff-appellee.

Norman H. Williams (argued), Barry W. Eubanks, and Robertson, Williams, Ingram & Overbey, Knoxville, Tenn., for Sears, Roebuck & Co. and Bruce Mason, defendants-appellants.

Before GUY and NORRIS, Circuit Judges, and BELL, District Judge.*

RALPH B. GUY, Jr. Circuit Judge.

Defendants Sears, Roebuck and Company (Sears) and its employee, Bruce Mason, appeal from the district court's amended judgment denying their motion for judgment notwithstanding the verdict (jnov) and awarding damages pursuant to a jury verdict in this breach of contract action against Sears and defamation action against Mason. The action was brought following Sears' termination of its contract with Davis that had established Davis as a Sears Authorized Catalog Sales Merchant (Merchant) in McCaysville, Georgia. The core of Sears' and Mason's appeal is that the district court erred in construing Georgia law and, thereby, erred in denying jnov as to the breach of contract and defamation claims. For the reasons that follow, we affirm the district court's denial of Sears' and Mason's motion for jnov as to the contract claim but reverse the district court's ruling on the defamation claim.

In 1971, Sears, a corporation organized and existing under the laws of the State of New York with its principal place of business in Illinois, and Davis, a citizen of the State of Georgia, entered into a Sears Authorized Catalog Sales Merchant Agreement (Agreement). Pursuant to the Agreement, Davis became an independent contractor operating a private business soliciting and receiving orders for and ultimately distributing Sears merchandise in McCaysville, Georgia. Essentially, Davis acted as a bailee in receiving and maintaining Sears merchandise for customer acceptance; title to the merchandise passed directly from Sears to the customer. Under the Agreement, Sears provided catalogs, signs, displays, and merchandise to Davis. Davis was solely responsible for his employees. He was also responsible for paying all license fees, most local and state taxes, and for securing a facility for his business. Although Davis could have leased space, he purchased land and constructed a building to house his catalog store and received design input from Sears. Davis and his new employees received approximately two weeks of training upon opening the McCaysville store.

Prior to 1971, Davis worked for the Tennessee Chemical Company for twenty-three years. Before leaving that position, at age forty, to become a Merchant, Davis allegedly was told by Sears that their Agreement would be renewed automatically each year, *ad infinitum*, barring any impropriety in Davis' operation of the store. The explicit duration provision in the Agreement, however, limits the Agreement to one year. The Agreement contains explicit termination provisions including one that authorizes either party to terminate the contract upon sixty days' notice. The Agreement also authorizes voluntary assignment of the Agreement and sale of business assets provided that the assignee/purchaser meets the standards then utilized by Sears in selecting new merchants and agrees to be bound by the Agreement.

Davis and Sears renewed their one-year Agreement without change each year from 1971 through 1984. Sales in Davis' store grew from $300,000 during its first year of operation to over one million dollars in gross sales in the 1980s. Some decline in net sales occurred in 1982 and 1984. Davis worked six days per week at his store and only took time off to attend the funeral of each of his parents. His store was well regarded by Sears. In fact, it won various promotional sales contests, including one during the 1984 Christmas season in which

---

* Honorable Robert Holmes Bell, United States District Court, Western District of Michigan, sitting by designation.

his store overwhelmingly exceeded a sales quota set by Sears.

During his operation of the catalog store, Davis contacted Sears when operating problems necessitated intervention.[1] In turn, Sears advised Davis of any problem noted in his store and gave him ample opportunity to cure it.

In June 1982, Sears' Area Consultant, Bruce Mason, a Tennessee resident, allegedly discovered an excessively high number of discounts given at the McCaysville store. Mason and Sears' Area Trainer, Lynn Tennyson, met with Davis in November 1982, in part, to review Sears' discount policies. Davis denies that discount policies were discussed at that meeting. Mason subsequently sent Davis a second copy of Sears' discount policy.[2] Sears' discount policy was also the alleged subject of a 1982 phone call between Mason and Davis.

In the fall of 1984, Mason again discovered an improper employee discount given at the McCaysville store to Charles Payne. Further investigation revealed that Payne was given improper discounts on sales approximating $11,700 over approximately one year. Payne was not a Sears employee or otherwise entitled to a discount. Mason did not contact Davis about this impropriety. Instead, the incident triggered an investigation into all McCaysville authorized discounts. The investigation spanned several months and involved five Sears employees and the Sears Atlanta shipping and auditing departments. The investigation revealed that Davis gave numerous improper employee, church, and school discounts on sales totalling over $100,000. Moreover, Sears alleges that Davis fraudulently documented sales to conceal the allegedly improper discounts and failed to properly document tax exempt sales.

Davis contends that he consistently authorized the same discounts from 1971 until the store was closed in 1985. Moreover, Davis and his principal employee, Laura (Penny) Davenport, contend that they never were advised that they were giving improper or unauthorized discounts. They further contend that before 1982, when Sears converted to computerized processing of sales, all McCaysville discounts were noted on the face of the catalog store ticket and submitted to the Sears Atlanta office for approval. If the discount was improper or lacked certain information, Sears' policy was to return the ticket for correction by the McCaysville store. From 1978 through 1982, no tickets were returned for improper discounts.

Subsequent to Sears' investigation, Davis received a phone call from Mason notifying him of Sears' intention to terminate their Agreement. Mason declined to explain the reason(s) for the termination. A letter sent to Davis, dated January 30, 1985, formalized Sears' intention to terminate its Agreement effective July 22, 1985, the closing date of the parties' then existing one-year Agreement. Although Sears produced testimony that the improper discounts ceased abruptly following its notice of termination to Davis, this testimony was refuted. The store closed on July 24, 1985. Davis attributes the sequence of events leading to the termination of his Agreement to a personality conflict between Mason and himself and to Mason's determination to remove Davis' store from him.

Although the Agreement provides that termination of the Agreement also terminates the parties' relationship and, by implication, extinguishes Davis' contractual right to *"voluntarily"* assign, transfer, or sell the Agreement, Sears nevertheless encouraged Davis to sell his business, even after their Agreement terminated, in order to facilitate the transition between Davis and his replacement Merchant. Sears,

1. For example, Davis enlisted Sears' aid in resolving two suspected instances of employee theft. The employees were discharged and Davis personally reimbursed Sears for its losses of $3,000.

2. Sears' discount policy authorizes a discount on all employee purchases. The employee discount does not extend to merchants like Davis because they are not Sears employees. Sears' discount policy also authorizes a 10% discount for tax exempt churches and schools on purchases exceeding $25.00 that are ordered from the general catalog. Those organizations are entitled to no discount on merchandise ordered from sale catalogs.

however, retained its right to approve the new Merchant. Sears provided applications to Davis for prospective merchants and Mason interviewed each of the six applicants referred by Davis. All six were rejected as failing to satisfy Sears' then existing, unwritten standards for selecting new catalog merchants.[3] As discussed below, during his interviews with prospective merchants, Mason made comments that ultimately became the basis for Davis' defamation claim against him. After rejecting the six applicants referred by Davis, Sears reviewed applicant files in Atlanta, Georgia, and hired Dan Kauffman to replace Davis as its Merchant. Although Sears attempted to orchestrate Kauffman's purchase of Davis' remaining business assets, no purchase occurred. Davis attributes the impasse to a clause in the purchase agreement requiring him to release Kauffman and Sears from any liability related to Davis' termination.

On June 28, 1985, Davis notified Sears by letter of an offer he had received from Mr. and Mrs. Scott McNeill to purchase his business assets for $135,000, and gave Sears fifteen days to match the offer. Mrs. McNeill previously had been rejected by Mason as a possible replacement for Davis. Sears responded that because the Agreement was terminated, there could be no voluntary assignment or sale of his business assets. Therefore, Sears claimed, the assignment provisions, which only authorize "voluntary" transfers, were no longer available to Davis. Moreover, Sears indicated that Mrs. McNeill failed to satisfy Sears' standards for new catalog merchants and could not be approved. Therefore, Sears declined to approve the anticipated transfer and was not interested in matching the offer. Thus, no sale of Davis' business assets occurred prior to or

after the termination of his Agreement with Sears. Kauffman reopened the Sears catalog store in a different facility approximately one month after Davis' store was closed.

In November 1985, Davis filed a complaint against Sears and Mason alleging that Sears breached the Agreement by its bad faith termination of Davis and by its bad faith failure to approve as the new Merchant any of the applicants whom Davis had referred to Sears and with whom he had allegedly reached an agreement for the sale of his business. Moreover, Davis claimed Mason defamed him during interviews with applicants for the Merchant position. Sears counterclaimed to recover improper discounts, records, and taxes theretofore uncollected by Davis. A jury found for Davis on both the breach of contract and defamation claims. The jury awarded Davis $600,000 in damages and Sears $2,000 in compensatory damages for improper discounts.[4] Thereafter, Sears filed a motion for jnov or, in the alternative, for a new trial, in addition to a motion to alter or amend the verdict by remittitur. The district court denied Sears' motion for jnov or a new trial but granted remittitur on the contract action.[5]

I.

JURISDICTION

■ Jurisdiction in this case is based on diversity, 28 U.S.C. § 1332. Under the *Erie* doctrine, *Erie RR Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), a federal court in a diversity case applies the law of the state in which it sits, including that state's choice of law provisions. *International Harvester Credit Corp. v. Hill*, 496 F.Supp. 329, 332 (M.D. Tenn.1979) (citing *MacPherson v. Mac-*

3. The standards then utilized reportedly included (1) honesty, (2) ability to maintain a good working relationship with Sears, (3) ability to efficiently manage a store, and (4) ability and intent to personally operate the store on a full-time basis.

4. The district court properly rejected Sears' contention that the jury verdict with respect to Sears' breach of contract in its termination of

the Agreement was impermissibly inconsistent with its finding that Davis gave improper discounts.

5. After Davis approved the remittitur, the district court entered judgment for him in the amount of $235,000, of which $135,000 was allocated to the breach of contract claim against Sears and $100,000 was allocated to the defamation claim against Mason.

*Pherson,* 377 F.Supp. 794, 796 (M.D.Tenn. 1973), *rev'd on other grounds,* 496 F.2d 258 (6th Cir.1974)). With respect to contracts, Tennessee's rule provides that the law where the contract was made controls absent a contrary intent. *Hill,* 496 F.Supp. at 332. Similarly, with respect to torts, Tennessee's law provides that the law of the place where the tort occurred controls absent a contrary public policy. *Winters v. Maxey,* 481 S.W.2d 755 (Tenn.1972).

██ In this case, the Agreement was executed in Georgia and no evidence suggests an intent for another state's law to be controlling. Thus, as the parties agreed at trial, Georgia law governs the parties' Agreement. Similarly, Mason's alleged defamation occurred in interviews conducted in Georgia. Therefore, Georgia law also controls the defamation claim.

## II.

## BREACH OF CONTRACT CLAIMS

Davis presented two breach of contract theories in the district court. First, Davis argued that Sears violated its implied duty of good faith and fair dealing in terminating their Agreement, notwithstanding express, unambiguous contract provisions giving either party the right to terminate. More specifically, Davis contends that Sears' termination of the Agreement was contrary to Sears' adherence to earlier oral promises of contract longevity as evidenced by fourteen years of *pro forma* contract renewal. The abrupt termination was also contrary to Sears' practice of notifying Davis of any operational problems and granting him adequate time to cure them. Second, Davis contends that Sears violated its implied duty of good faith in failing to approve as the new Merchant any of the prospective purchasers of his store with whom Davis had allegedly reached an agreement.

Our standard of review with regard to these contract claims provides that "[w]hen reviewing the district court's interpretation of a contract ... an appellate court is not limited by the 'clearly erroneous' rule. *Policy v. Powell Pressed Steel Co.,* 770

F.2d 609, 612 (6th Cir.1985), *cert. denied,* 475 U.S. 1017, 106 S.Ct. 1202, 89 L.Ed.2d 315 (1986). The interpretation and construction of a written contract, as required here, are matters of law, thus allowing de novo review. *Weimer v. Kurz–Kasch, Inc.,* 773 F.2d 669, 671 (6th Cir.1985)." *Lancaster Glass Corp. v. Philips ECG, Inc.,* 835 F.2d 652, 658 (6th Cir.1987) (citations omitted).

### A. Termination

██ With respect to termination of the contract, there is no question that Sears complied with the literal language of the Agreement. The pertinent duration and termination provisions provide:

*SECTION 5.*

5.1 The term of this Agreement will be for a period of one (1) year beginning July 22, 1984 and ending July 22, 1985, and from year to year thereafter, subject to termination upon the conditions described herein.

5.2 Either party may terminate this Agreement by giving written notice to the other party not less than sixty (60) days prior to the conclusion of the term of this Agreement or of any renewal period.

Although Sears terminated its Agreement with Davis pursuant to section 5.2, other termination provisions were available in the event of default, impossibility, delinquency, bankruptcy, or health problems.

The contract termination dispute revolves around Sears' obligation of good faith and fair dealing, under Georgia law, in the face of an otherwise unambiguous and definite termination provision. The district court recognized that Georgia law dictates that full effect be given to express contractual provisions. *Opelika Mfg. Corp. v. Hawkinsville,* 525 F.2d 941 (5th Cir.1976); *see also Insurance Concepts, Inc. v. Western Life Ins. Co.,* 639 F.2d 1108, 1112 (5th Cir.1981) ("Where the language of a contract is definite and unambiguous, the contract will be enforced according to its terms ... [with no] need to resort to surrounding circumstances to construe the meaning of the agreement." (Ci-

tation omitted)). The district court also recognized, however, that Georgia law also implies a duty of good faith and fair dealing in every contract, *Kleiner v. First Nat'l Bank of Atlanta*, 581 F.Supp. 955, 960 n. 5 (N.D.Ga.1984). The court determined that the obligation of good faith and fair dealing pervades all contracts whether or not the contract is governed by the Uniform Commercial Code. *See Flynn v. Gold Kist, Inc.*, 181 Ga.App. 637, 353 S.E. 2d 537 (1987) (company obliged to perform output and requirements contract in good faith whether or not contract governed by UCC). Therefore, the court submitted the issue of Sears' good faith and fair dealing to the jury *vis-a-vis* Sears' exercise of its termination rights under the contract.

Our review of Georgia law persuades us that the definite and unambiguous contractual language governing termination should have been given full effect. Therefore, the issue of Sears' good faith in terminating the Agreement improperly was placed before the jury.

True enough, *Kleiner* provides that good faith is an element of every contract and references Restatement (Second) of Contracts § 205. Section 205 provides: "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." Georgia law imposes the same duty in all contracts whether or not governed by the Uniform Commercial Code. *See* Ga.Code Ann. § 11–1–203 (1982) ("Every contract or duty within [the UCC] imposes an obligation of good faith in its performance or enforcement."); Ga.Code Ann. § 13–4–20 (1982) ("Performance ... must be substantially in compliance with the spirit and the letter of the contract...."). *See also Crooks v. Chapman Co.*, 124 Ga.App. 718, 185 S.E.2d 787 (1971). Good faith has been interpreted by Georgia courts as "a minimum standard of conduct in any contract ... call[ing] for 'substantial compliance with the spirit, and not the letter only, of the contract' in its performance." *Crooks*, 124 Ga.App. at 719–20, 185 S.E.2d at 789.

The legitimacy of bad faith as a cause of action in Georgia, however, has proven somewhat elusive. For example, notwithstanding Georgia's good faith requirement inherent in every contract, in *Management Assistance, Inc. v. Computer Dimensions, Inc.*, 546 F.Supp. 666 (N.D.Ga.1982), *aff'd sub nom. Computer Dimensions v. Basic Four*, 747 F.2d 708 (11th Cir.1984), the court concluded that the good faith requirement codified at section 11–1–203 of Georgia's Uniform Commercial Code provides no independent basis for a cause of action.

Our task is to reconcile the duty of good faith inherent in every contract with express contractual provisions governing termination.[6] To the extent that Georgia courts have considered the obligation of good faith in the context of termination of a contract, it appears that when one party has the unilateral right to terminate a contract based on unacceptable performance by the other party, the party terminating the contract must act honestly and in good faith. Moreover, the dissatisfaction must be real and not pretended. *See Commercial Mortgage and Finance Corp. v. Greenwich Savings Bank*, 112 Ga.App. 388, 145 S.E.2d 249 (1965). For example, in *American Game & Music Service, Inc. v. Knighton*, 178 Ga.App. 745, 344 S.E.2d 717 (1986), the court determined that a contract that provided for termination in the event that a lessor deemed inadequate the amount of income generated by its video arcade machines at a lessee's business was modified by a requirement of good faith. The court indicated that termination of the contract predicated on dissatisfaction feigned in order to avoid the contract would be in bad faith. Therefore, the court rejected the lessor's contention that he had the unfettered right to terminate the contract and denied his motions for a directed verdict, judgment notwithstanding the verdict, and a new trial. The court's view in *Greenwich* and *Knighton* is consistent with its observations in *Kleiner*, a case that did not arise in the context of contract termination. *Kleiner* involved a challenge

6. For jurisdictions that have found that an express power to terminate a contract is modified by a duty of good faith, see Restatement (Second) of Contracts, comment c.

of the manner in which a bank determined the prime rate to which plaintiff's interest charges were contractually tied. After noting that neither party had "addressed whether the Bank ha[d] any contractual obligation in making the estimates on which the prime rate is set," the court indicated that "where an agreement permits one party to unilaterally determine the extent of the other's required performance, an obligation of good faith in making such a determination is implied." 581 F.Supp. at 960 (footnote omitted). Thus, because the bank had the unilateral contractual power to set the prime rate, the court determined that "the Bank may have had an obligation to estimate in good faith the lowest interest rate it expected to offer on 90–day loans to commercial customers." *Id.* at n. 5. *See also In re Royal*, 75 B.R. 50 (Bankr.S.D. Ga.1987) (creditor with unilateral discretion to set contract terms must uphold spirit as well as letter of agreement in exercising that discretion).

In the present case, we note that the contractual relationship between Sears and Davis differs significantly from that of the parties in *Knighton, Kleiner, Greenwich,* or *In re Royal* because the termination rights under section 5.2 of the parties' Agreement were equally available to both Sears and Davis. Hence, Sears did not have a unilateral contractual right determinative of Davis' degree of performance. Davis readily could have terminated the Agreement on his own initiative and left Sears in a lurch with respect to its catalog business in McCaysville. Therefore, we see no reason to modify Georgia's well-settled practice of giving full effect to express, definite, unambiguous contract provisions.

Our view is supported by *Automatic Sprinkler Corp. v. Anderson,* 243 Ga. 867, 257 S.E.2d 283 (1979), in which the court considered "whether good faith is a prerequisite in the exercise of an absolute discretion to withhold incentive compensation." *Id.* at 867, 257 S.E.2d at 284. In *Automatic Sprinkler,* the court explicitly stated

"[t]here can be no breach of an implied covenant of good faith where a party to a contract has done what the provisions of the contract expressly give him the right to do." *Id.* at 868, 257 S.E.2d at 284. *See also Marathon US Realties, Inc. v. Kalb,* 244 Ga. 390, 260 S.E.2d 85 (1979) (motive of escrow agent who expressly covenanted to act in good faith deemed immaterial when agreement expressly gave agent the option to deny payment pending final judgment of conflicting payment claims); *Georgia Power Co. v. Busbin,* 242 Ga. 612, 250 S.E.2d 442 (1978) (allegations of improper motives in employee discharge are irrelevant when employee is terminable at will).

In the present case, Sears did no more than exercise its right as expressly authorized by the parties' Agreement. Therefore, the district court erred in submitting to the jury the issue of Sears' good faith in terminating the Agreement.[7]

### B. Failure to Approve

Davis' second breach of contract claim alleges that Sears breached its implied duty of good faith in failing to approve as Sears' new Merchant any of the persons to whom Davis had agreed to sell his business.

The pertinent Agreement provisions concerning assignment provide:

*SECTION 7.*

7.1 Upon Merchant's written notification, Sears will permit the assignment of this agreement, subject to para. 7.2 below, where the assignee meets the standards then utilized by Sears in selecting new Merchants.

7.2 If the Merchant voluntarily decides to sell, transfer, assign or to otherwise dispose of the assets of the Merchant's business, the Merchant shall promptly give Sears written notice of this intention and Sears shall have the right of first refusal and privilege (hereinafter referred to as the "option") of purchasing such a business at a fair market value to be determined by Sears and the Merchant, such option to be exercised within

---

7. Our disposition of this issue renders it unnecessary to consider Sears' contention that the district court erred by admitting parol evidence to modify section 5.2 of the Agreement.

thirty (30) days after Sears receives said written notice from the Merchant.

If (i) Sears does not exercise the option within the thirty (30) day period provided in the above paragraph, or (ii) Sears exercises the option, but Sears and the Merchant cannot agree upon a fair market value for the business, then the Merchant shall be free to offer the business to third parties. Upon receipt of any bona fide offer for the business from a third party, the Merchant shall immediately notify Sears in writing of the terms and conditions of such offer, and Sears shall have a further option, to be exercised within fifteen (15) days after receipt of such written notice, to purchase the business upon the same terms and conditions as contained in the bona fide offer. If Sears shall not exercise this further option, the Merchant shall be free to sell the business to the third party making the offer under the same terms and conditions as contained in such offer, provided that such third party meets the standards then utilized by Sears in selecting new Merchants and agrees in writing to be bound by the provisions of this Agreement.

The pertinent Agreement provisions governing the parties' relationship following termination provide:

*SECTION 6.* Upon the expiration or termination of this Agreement for any reason, Merchant agrees to the following:

6.1 That Merchant will immediately discontinue the use of the names "Sears", "Sears, Roebuck and Co.", "Sears Authorized Catalog Sales Merchant", or any references thereto, and will immediately remove and return any signs, emblems or other identification on which such phrases appear.

6.2 That Merchant will return to Sears all customer and display merchandise, and all catalogs, forms, signing, customer lists, documentation relating to the sale and movement of Sears merchandise, and any other Sears property present at the store. Sears will have the immediate right to enter Merchant's premises and remove any of said property upon termination or expiration of this Agreement.

■ Sears contends that the district court erred in determining that Sears waived the contractual requirement that any assignment of the Agreement must be voluntary. The district court's finding of waiver was based on Sears' conduct encouraging Davis to sell his business both after notifying him of the impending termination of the Agreement and after the actual expiration of the Agreement. Moreover, testimony disclosed a Sears policy of permitting a merchant to sell his business upon nonrenewal of his contract. The fact that Mason, on behalf of Sears, interviewed the six applicants referred by Davis further evidences Sears' waiver of the voluntariness requirement. *See Aaron Rents, Inc. v. Corr,* 133 Ga.App. 296, 211 S.E.2d 156 (1974) (defining waiver as the voluntary relinquishment of a known right, benefit, or advantage and stating that waiver may be inferred by course of conduct); *Southern Life Ins. Co. v. Citizens Bank,* 91 Ga.App. 534, 86 S.E.2d 370 (1955) (a party who leads another to believe that strict compliance with contract terms is not required cannot complain when another party relies on its acquiescence evidenced by course of conduct). We concur with the district court's finding of waiver here. Therefore, we reject Sears' argument that its conduct was tantamount to a unilateral gratuitous gesture conferring on Davis greater rights than those bestowed by the Agreement. We also reject Sears' contention that Davis was precluded from assigning the Agreement because he failed to comply with the Agreement's explicit assignment provisions, and thereby deprived Sears of its thirty-day option to purchase Davis' business at a mutually determined fair market value. This contention is raised for the first time on appeal and, therefore, is not properly before us. *Boone Coal and Timber Co. v. Polan,* 787 F.2d 1056, 1064 (6th Cir.1986).

■ The remaining contract issue is whether Sears violated its implied duty of good faith by refusing to approve as Mer-

chant any of the candidates referred by Davis who had agreed to purchase his business. Although section 7.2 of the Agreement gives Davis the right to assign his Agreement and to sell his business assets, those rights are expressly contingent upon two conditions. The assignee/purchaser must first meet the standards then utilized by Sears in selecting new catalog merchants, and second, must agree to be bound by provisions of the Agreement. We find that these conditions give Sears the same type of unilateral power that necessarily was modified by the implied obligation of good faith contemplated in *Kleiner,* 581 F.Supp. 955; *In re Royal,* 75 B.R. 50; *Knighton,* 178 Ga.App. 745, 344 S.E.2d 717; *Greenwich,* 112 Ga.App. at 388, 145 S.E.2d 249. *But see Automatic Sprinkler,* 243 Ga. 867, 257 S.E.2d 283; *Busbin,* 242 Ga. 612, 250 S.E.2d 442. In this case, Sears alone had the right to determine the then existing standards governing selection of catalog merchants and whether any of the Davis-referred applicants satisfied those standards. *See supra* n. 3. Although Sears' right is undisputed, Sears, nevertheless, must exercise its unilateral right in good faith. That is, Sears could not feign dissatisfaction with the applicants referred by Davis so as to, for example, deprive him of the best price for his business. Sears put forth persuasive testimony describing its previously noted merchant selection standards and why the Davis-referred applicants were rejected. According to Sears, one applicant withdrew, two would only work part-time, and one was rejected because Sears found her belligerent and feared that her overbearing husband would dominate the store. Davis' daughter and son-in-law were rejected on the basis of business judgment, and the final applicant was rejected because he did not personally plan to run the store. Davis' contrary testimony indicates that Sears' standards were unwritten and that the interviewer allegedly conversant with these standards was unable to articulate them in response to an applicant's direct inquiry. Additionally, Davis points out testimony indicating that an applicant rejected as only willing to work part-time did indeed

plan to work full-time within a short time. Finally, Davis notes that Sears did not evaluate the applicants' qualifications or contact any of their references. Moreover, as discussed below, Sears allegedly conducted its interviews in bad faith by casting the McCaysville store in its worst possible light. In view of these facts, the issue of Sears' good faith in failing to approve any of the Davis-referred applicants as the Merchant properly was placed before the jury.

C. Judgment Notwithstanding the Verdict.

We next consider whether the district court erred in denying Sears' motion for jnov on the breach of contract claim. We first note that "[a] federal court exercising its diversity jurisdiction applies the standard of the state whose substantive law governs the action in determining the propriety of a directed verdict or a judgment notwithstanding the verdict." *O'Neal v. Burger Chef Systems, Inc.,* 860 F.2d 1341, 1347 (6th Cir.1988). Thus, we must look to Georgia law to determine the appropriate standard for granting a jnov. In Georgia, the standard is the same as that governing a motion for a directed verdict. The motion may be granted only if, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment. *Johnston v. Bill Fancher & Associates,* 179 Ga.App. 67, 68, 345 S.E.2d 144, 146 (1986). That is, to grant a directed verdict or jnov, the evidence must not be in conflict as to any material issue and the evidence, coupled with all reasonable inferences and deductions therefrom, must dictate a particular verdict. *Flynn v. Gold Kist, Inc.,* 181 Ga.App. 637, 353 S.E.2d 537.

Our review indicates that evidence on material issues is sufficiently in conflict to preclude finding that a particular verdict must lie. As indicated, Sears held the unilateral power to uphold or reject any deal negotiated by Davis. The evidence as to whether or not Sears exercised that power in good faith is in conflict. Therefore, without reiterating the conflicting evi-

dence, we conclude that the district court properly denied Sears' motion for jnov on the contract claim.

### D. Effect of Disposition of Contract Claims on the General Verdict

The jury found that Sears breached its contract with Davis but did not allocate damages among the two theories alleged by Davis.[8] Instead, it awarded one lump sum for the breach, which was subsequently reduced by remittitur to $135,000. This amount represented the amount of the alleged offer of Mr. and Mrs. McNeill to Davis for his business assets, which suggests that the ultimate amount of damages awarded for the breach of contract was tied to Sears' bad faith failure to approve any applicants with whom Davis had negotiated the sale of his business. Nevertheless, the fact that the jury's verdict may have been predicated on one proper and one improper count is not fatal to the verdict. In Georgia, as in Tennessee, if a cause of action alleges breach of the same contract in different manners, a general verdict can be sustained provided either count is supported by the evidence. *Williams v. Smith,* 71 Ga.App. 632, 31 S.E.2d 873 (1944).[9] Thus, our disposition of Davis' first breach of contract theory does not contaminate the jury's verdict because Davis prevailed on his second theory, which was supported by the evidence.

### III.

### THE DEFAMATION CLAIM

Mason challenges the jury's verdict against him on Davis' defamation claim, contending that the district court erred,

first, by submitting the issue of defamation to the jury and, second, by refusing his motion for a directed verdict or jnov. The alleged defamatory statements indicated that Davis' store was unprofitable and poorly run, Davis' sales had been declining for the past several years, Davis' store derived income was only half of what he had represented it to be, and that Davis' store was likely to close in one and one-half to two years due to a depressed local economy. Mason also allegedly said that if Davis could not live on $90,000 per year, Sears would find someone who could.

Georgia's statute on slander provides in pertinent part:

**51–5–4. Slander defined; when special damage required; when damage inferred.**

(a) Slander or oral defamation consists in:

. . . .

(3) Making charges against another in reference to his trade, office, or profession, calculated to injure him therein; or

. . . .

(b) In the situation described in paragraph (4) of subsection (a) of this Code section, special damage is essential to support an action; in the situations described in paragraphs (1) through (3) of subsection (a) of this Code section, damage is inferred. . . .

Ga.Code Ann. § 51–5–4 (1982).

Georgia law recognizes defamation per se, in which a publication is defamatory on its face, and defamation by innuendo, in which a publication, though not defamatory

8. The pertinent provisions of the jury's verdict form with regard to the contract claim provide:
   1. WE FIND THAT DEFENDANT SEARS, ROEBUCK AND COMPANY DID BREACH ITS CONTRACT WITH PLAINTIFF.
   2. WE FIND THAT PLAINTIFF IS ENTITLED TO $500,000.00 IN COMPENSATORY DAMAGES AS A RESULT OF SEARS' BREACH OF CONTRACT WITH PLAINTIFF.

9. Sears claims that *Georgia Power Co. v. Busbin,* 242 Ga. 612, 250 S.E.2d 442 (1978), dictates that when the court cannot determine whether the verdict was entered on a proper basis, the verdict cannot stand. The principle in *Busbin* is

distinguishable from that in *Smith.* While *Smith* involved one viable theory of recovery (breach of contract) based on two different counts, one of which was deemed improper, *Busbin* involved a verdict rendered against two defendants on various theories, some of which were deemed improper. Because the court could not determine that the general verdict against both defendants was entered on a proper basis, the verdict could not stand. In the present case, Davis has alleged breach of one contract in two different manners. Hence, *Smith* dictates that the verdict is sustainable.

on its face, has several possible interpretations, one of which is defamatory. *Southard v. Forbes*, 588 F.2d 140 (5th Cir.), *cert. denied*, 444 U.S. 832, 100 S.Ct. 62, 62 L.Ed.2d 41 (1979). Defamation by innuendo requires ambiguity in a statement giving rise to potentially defamatory meaning. *Dun & Bradstreet, Inc. v. Miller*, 398 F.2d 218 (5th Cir.1968). Moreover, "plain, non-defamatory, unambiguous words may not be enlarged by innuendo." *Id.* at 222. In either case, the court initially must determine whether a particular publication has a potentially defamatory meaning. *Forbes*, 588 F.2d at 143. In making this determination, the court must construe comments, like Mason's, as a whole, based on their plain, natural, and ordinary meaning, as others would perceive them. *Id.* Moreover, the court must consider the context of such comments and the ideas they were meant to convey. *Id. See also Burrow v. K–Mart Corp.*, 166 Ga.App. 284, 304 S.E.2d 460 (1983). Although no special damages must be proven by a plaintiff alleging defamation in connection with his trade or business, the alleged defamatory statements must be calculated to injure him therein. Ga.Code Ann. § 51–5–4 (1982). Georgia also recognizes that truth is a defense [10] to slander and that certain communications are deemed privileged.[11]

The district court determined that Mason's comments to prospective purchasers referred by Davis as potential merchants were capable of defamatory meaning with regard to Davis' integrity and honesty in dealing with those prospective purchasers. Accordingly, the judge submitted to the jury the issues of whether Mason's comments were defamatory and, if so, whether the defenses of truth and privilege were applicable.

Our review of Mason's statements, in the context in which they were made and as others would perceive them, however, persuades us that the district court erred in placing the defamation issue before the jury and again by not granting a directed verdict or jnov on this issue. Our conclusion rests on several factors. For one, we note that the alleged defamatory statements occurred during interviews conducted by Mason with potential new merchants. Sears had an interest in and obligation to fairly represent its McCaysville store and market to these applicants and to verify that the information received by them from Davis was accurate. To that end, any seemingly defamatory comments were made in the spirit of honestly apprising potential merchants of what to expect as the Merchant rather than as calculated attempts to injure Davis in his trade or business. For example, Mason's statements regarding declining McCaysville sales and a declining economy that might necessitate closing the McCaysville store had nothing to do with Davis' character or reputation in his trade or business. The record shows that McCaysville sales had declined in 1982, 1984, and 1985, and that with the imminent layoff of nearly 2,000 local workers and a declining economy, sales were likely to plummet further. This information is important to the potential Merchant about to invest time, money, and energy in a new business. Similarly, Mason's comment that Sears did not regard the McCaysville store as well run or profitable because of Davis' failure to abide by Sears' return, allowance, and discount policies was not calculated to injure Davis in his trade or business. Rather, the comment evidenced Sears' dissatisfaction with the manner in which Davis ran the store and conveyed its expectation that the new Merchant would be more compliant. Moreover, the record re-

---

10. Ga.Code Ann. § 51–5–6 (1982) reads:

   **51–5–6. Truth as justification.**
      The truth of the charge made may always be proved in justification of an alleged libel or slander.

11. Ga.Code Ann. § 51–5–7 (1982) provides in pertinent part:

   **51–5–7. Privileged communications.**

The following communications are deemed privileged:
   (1) Statements made in good faith in the performance of a public duty;
   (2) Statements made in good faith in the performance of a legal or moral private duty;
   (3) Statements made with a good faith intent on the part of the speaker to protect his interest in a matter in which it is concerned....

veals that Davis' failure to abide by Sears' standards and policies was the very reason why Sears was replacing him. Finally, the statement implying Davis' inability to live on $90,000 annually conveyed nothing about his trade or business and, accordingly, did not constitute defamation within the meaning of the statute.

■ Even if Mason's comments somehow were deemed defamatory, we are persuaded that Mason could avail himself of truth or privilege as a complete defense. Sales had declined at the McCaysville store and the McCaysville economy was also declining. Accordingly, there was genuine concern by Sears about the longevity of its McCaysville store. Sears' comments regarding Davis' management of the McCaysville store were also true. Numerous management improprieties were attributed to Davis and apparent in the record. Thus, Mason's comments to potential merchants reflected genuine concerns about documented prior management practices.

Finally, although Davis had represented his store-derived income at $90,000, Davis' responsibility to pay operating expenses reduced that income to $45,000. Accordingly, any statement to the effect that Davis' income was less than he represented it to be was also true, and Sears had an interest in clarifying that the Merchant is responsible for paying all store operating expenses out of sales commissions.

The defense of privilege extends to otherwise defamatory statements made with a good faith intent by the speaker to protect his interest in a matter of concern to him. Ga.Code Ann. § 51–5–7(3) (1982). In the present case, Sears had a genuine interest in advising potential merchants of pertinent economic conditions affecting the store and of acceptable and unacceptable management practices. Accordingly, these statements were made to protect Sears' interest in a mutually productive and rewarding relationship with its new Merchant, and the comments were made only to applicants for the new Merchant position.

As a final matter, we note that although Georgia law provides that no special damages need be proven by a plaintiff who has alleged defamation in connection with his trade or business, the alleged statements must be calculated to injure plaintiff in his trade or business. Ga.Code Ann. § 51–5–4(3) (1982). In this case, we are persuaded not only that Mason's comments were not calculated to injure Davis, but also that Davis suffered no harm as a consequence of those statements. The applicants to whom the statements were made attested to Davis' good reputation before and after the statements. Moreover, none of the applicants were dissuaded from purchasing Davis' store as a result of those statements.

Thus, the district court should not have placed the defamation issue before the jury in the first place and, once it did, should have granted a directed verdict or jnov on that issue.

AFFIRMED IN PART and REVERSED IN PART.